**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL VILKIN,<br><br>                              Petitioner,<br><br>v.<br><br>ROBERT NEUSCHMID, Warden, et al.,<br>                              Respondents. | Case No.:  18cv0433-L (AGS)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE TO DENY PETITION FOR WRIT OF HABEAS CORPUS** |

     Michael Vilkin is a state prisoner proceeding by and through counsel with a petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  He challenges his San Diego County Superior Court convictions for first degree murder and assault with a firearm, claiming, as he did in state court, that his federal constitutional rights were violated by ineffective assistance of trial counsel in failing to move for a mistrial after the prosecutor elicited from a defense expert on the fight-or-flight syndrome that it is a "fad" defense (claim one), insufficient evidence supported giving a contrived self-defense jury instruction stating a defendant does not have the right to self-defense if he provoked a fight with the intent to excuse his use of force (claim two), ineffective assistance of counsel due to trial counsel's failure to object to the contrived self-defense instruction on the basis it was not supported by the evidence (claim three), and by the cumulative effect of those errors (claim four).  (Id. at 6-9.)

Respondent filed an Answer and lodged portions of the state court record. (ECF Nos. 7-8.) Respondent contends federal habeas relief is unavailable because the state court adjudication of Petitioner's claims is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. (Answer at 2-3; Memo. of P&A in Supp. of Answer ["Ans. Mem."] at 25-40.) Petitioner filed a Traverse. (ECF No. 9.)

For the following reasons, the Court finds federal habeas relief is unavailable because the state court adjudication of Petitioner's claims was neither contrary to, nor an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The Court recommends the Petition be denied.

## I. PROCEDURAL BACKGROUND

In a two-count Information filed in the San Diego County Superior Court on October 7, 2013, Petitioner was charged with murder in violation of California Penal Code § 187(a) (count one), and assault with a firearm in violation of California Penal Code § 245(a)(1) (count two). (Lodgment No. 2, Clerk's Transcript ["CT"] at 4-5.) The Information alleged Petitioner personally discharged a firearm which proximately caused death during the commission of count one within the meaning of California Penal Code § 12022.53(d), and personally used a firearm during the commission of count two within the meaning of California Penal Code § 12022.5(a). (Id.)

On June 20, 2014, a jury found Petitioner guilty on both counts and found both firearm use allegations true. (CT 237-38.) On March 18, 2015, he was sentenced on count one to 25 years to life with a consecutive term of 25 years to life for the firearm use enhancement, and on count two to a consecutive term of 4 years with a consecutive 10-year term for the firearm use enhancement, for a total of 64 years to life. (CT 244.)

Petitioner appealed, raising the same claims presented here, along with an additional claim alleging insufficient evidence to support the murder conviction. (Lodgment Nos. 4-

6.)  The appellate court affirmed in all respects.  (Lodgment No. 7, <u>People v. Vilkin</u>, No. D067753, slip op. (Cal.App.Ct. Sept. 2, 2016).)  He then filed a petition for review in the California Supreme Court presenting the claims raised here.  (Lodgment No. 8.)  That petition was summarily denied.  (Lodgment No. 9, <u>People v. Vilkin</u>, No. S237682, order (Cal. Nov. 30, 2016).)

## II.  UNDERLYING FACTS

The following statement of facts is taken from the appellate court opinion on direct appeal.  This Court gives deference to state court findings of fact and presumes them to be correct.  <u>Sumner v. Mata</u>, 449 U.S. 539, 545-47 (1981).

### A. *Background*

In 2008, defendant purchased a two-and-a-half-acre undeveloped lot on Lone Jack Road in Encinitas (lot).  Defendant planned to get a construction loan, build on the lot and sell it in the future.  Defendant spent about five or six days each week, usually between about 3:00 to 8:00 p.m., working on, and clearing, the lot.  Defendant allowed his neighbors to use the lot to walk their dogs and park their cars.

Witness John Bonanno testified that, in 1996, he bought a home on Lone Jack Road that was adjacent to the lot subsequently purchased by defendant.  An easement ran across a private road on defendant's lot, which allowed neighbors to access their homes.

### B. *The Prosecution*

In April 2011, Bonanno rented his home to murder victim John Upton (count 1) and his girlfriend, Evelyn Zeller (count 2).  Although Bonanno did not know Upton or Zeller when they initially rented from Bonanno, Bonanno and Upton became friends as time went on.

Bonanno met defendant in 2010.  Bonanno described their meeting as cordial, as defendant was then in the process of clearing the lot and attempting to smooth it out after a landslide had occurred on a portion of the lot in 2005.  Bonanno estimated he came in contact with defendant in total about six times.

On one occasion in the fall of 2012, after Upton and Zeller had moved in, Upton called Bonanno early on a Saturday morning and asked Bonanno to

speak to defendant because Upton thought defendant was on Bonanno's property, and, despite Upton's pleas, defendant "just (would not) . . . stop cutting bushes and chopping things up into little sticks." When Bonanno arrived, he and Upton spoke to defendant.

According to Bonanno, Upton pleaded with defendant to be finished clearing the lot. Upton suggested defendant obtain a permit and build on the lot, or sell it, but reiterated to defendant his constant cutting and chopping of shrubs on the lot was driving Upton "nuts." Bonanno testified defendant responded he was "done," "finished," clearing the lot.

Bonanno described Upton's demeanor as "elevated" during what Bonanno estimated was about a 10-minute conversation. According to Bonanno, defendant was "visibly angry" during this exchange and was repeatedly clinching his fist while holding a shovel in his other hand. Defendant also moved closer to Upton and Bonanno during this conversation. At one point, defendant was about six to eight feet away. Neither Bonanno nor Upton approached defendant, however.

As Upton and Bonanno started walking back to Bonanno's house, defendant attempted to discuss a road defendant wanted. Bonanno responded that defendant needed to speak to the "city" about the road; that it was his understanding the city would never allow such a road; and that defendant was going to need a permit and approval from the city if defendant wanted a road.

San Diego County Deputy Sheriff Scott Hill testified that he spoke to defendant by telephone on October 31, 2012 when defendant inquired "about the specifics of the law in regards to carrying and use of a firearm." Defendant told Deputy Hill he wanted this information because defendant "was having a property dispute with a neighbor." Specifically, defendant told Deputy Hill he "was developing a property and he wanted to put in a driveway and the neighbor was complaining that the proposed driveway would necessitate the removal of some vegetation that he had planted—or that was planted."

On questioning, defendant told Deputy Hill he had not been threatened and his neighbor had "not taken any aggressive action towards him." Given the nature of defendant's inquiry about carrying a gun, Deputy Hill was concerned of the potential for violence between defendant and his neighbor. Deputy Hill testified that, based on this conversation, there was "no articulable reason" defendant could provide regarding why he was "so greatly concerned" for his safety and why he "had gone to the steps of purchasing a firearm and want(ing) to carry it."

4

As summarized *post*, defendant purchased two guns to "protect" himself from Upton. Defendant in August 2012 purchased a .22 revolver. Defendant did so because, in his view, Upton's behavior was "bad enough to cause (defendant) to call the Sheriff Department" and because the sheriff's department "refused to help (defendant)." Defendant in about October 2012 purchased a .44 Rugar after he did "some research on the Internet" and determined that a .22 revolver was "simply not a serious weapon" and would "not stop a big guy" like Upton.

During their telephone conversation, Deputy Hill also told defendant that he was not allowed to give any legal advice. When defendant gave Deputy Hill several legal reasons based on "research" defendant had done as to why he was justified in carrying "his firearm" on the lot, Deputy Hill suggested defendant contact a lawyer. Unsatisfied with Deputy Hill's response, defendant repeated that he had done research which showed defendant was allowed to carry a firearm on his own property. Deputy Hill reiterated he was not allowed to give legal advice and also warned defendant that it was a "very bad idea to carry a firearm . . . when you're expecting an argument, especially when there are no threats made," and that defendant could end up being "arrested" and "charged with a crime" if he made a "bad choice."

About a week later, defendant approached Deputy Hill and his partner after the deputies were finishing a call at an apartment complex in Encinitas near defendant's home. Deputy Hill testified defendant started asking his partner the "same questions" he had asked Deputy Hill over the phone, after relaying the "same information" defendant had previously given Deputy Hill. Deputy Hill testified he told defendant during this second contact that he was the deputy that defendant had spoken to a week earlier. According to Deputy Hill, defendant "wanted to be told it was okay to carry a firearm." In response, Deputy Hill told defendant "a second time" that deputies were not permitted to give legal advice and recommended defendant contact a lawyer.

Witness Vince Sampo testified that, toward the end of 2012, defendant hired him to survey the lot, locate any missing monuments, determine if there was a potential encroachment on the lot and mark the boundaries of the lot in connection with defendant's desire to construct a road. After visiting the lot in November 2012, Sampo asked defendant to remove about three feet of vegetation in an area where Sampo had been digging in an effort to locate specific monument markers.

Sampo testified that, while he was on the lot in November 2012, defendant escorted him to defendant's open car trunk and said, "'I have this gun,'" while showing Sampo what Sampo described as a long silver pistol in a case. Defendant then told Sampo that he had purchased the gun because "he was threatened by the neighbor" and that he "would rather spend (his) life in prison than . . . get blown away or get shot," or words to that effect. Sampo testified that he was frightened and uncomfortable when defendant showed him the gun.

San Diego County Deputy Sheriff Marshall Abbott testified he was dispatched to the lot on March 21, 2013. On contact, defendant told Deputy Abbott he called the sheriff's department because his surveyor, who was on the lot working, needed some brush cleared and defendant wanted to avoid a "confrontation" with his neighbor Upton. Defendant told Deputy Abbott he felt "threatened" by Upton. When Deputy Abbott asked defendant to provide examples of how Upton had threatened him, defendant stated that Upton had "yelled at him" and that they had "some arguments about cutting down brush." Deputy Abbott testified that he did not consider such conduct by Upton to be a "criminal kind of threat" and that defendant then denied any physical contact had taken place between him and Upton.

Deputy Abbott next contacted Upton and asked him to move a vehicle that was parked on the easement, at the request of the surveyor. Upton complied. According to Deputy Abbott, Upton was calm but frustrated. Upton told Deputy Abbott that defendant kept cutting trees and shrubs in the area when defendant did not have the money for a road.

Deputy Abbott testified he told Upton to call the sheriff's department if there was a problem with defendant and to avoid a physical confrontation. Upton agreed. As Deputy Abbott and Upton spoke, defendant slowly approached and made a statement or comment that upset Upton. Upton in response stated, "Don't come any closer to me you fucking asshole," or words to that effect. Deputy Abbott diffused the situation and reiterated both to Upton *and* defendant they should avoid anything physical and instead call him and/or the sheriff's department.

Zeller testified Upton was her life partner, and they had been together for about two and a half years before the shooting. Zeller had a few contacts with defendant that did not include Upton. On a couple of those occasions, Zeller expressed her opinion that it made no sense for defendant to remove the vegetation on the lot and make it a "dirt hill" because, previously, there had been a landslide on the lot which had damaged several surrounding

properties, including the property she and Upton shared. Defendant in response told Zeller he could do what he wanted on his property.

Zeller recalled an interaction between Upton and defendant that took place in November 2012. In the middle of the night while Zeller was sleeping, Upton heard some noise outside and saw defendant pruning some trees near their front door using a car headlamp as a light. Upton went outside and asked defendant not to prune the trees and bushes that were healthy and that provided a privacy screen for Upton and Zeller. According to Upton, who relayed the story to Zeller the following morning, defendant and Upton shook hands after defendant agreed only to trim the "dead branches."

The next morning, Upton and Zeller awakened to find all the trees and bushes in the area where defendant had been working the night before "cut down to the ground," leaving only stumps. That afternoon, while walking their dogs, Upton and Zeller contacted defendant. Zeller described Upton as upset, and Upton yelled at defendant: "'What are you doing? We had an agreement, what are you doing?'" According to Zeller, defendant also was upset and yelled back in response: "'Fuck you, get the fuck off of my property. You can't stop me. I can do whatever I want.'" Defendant did not appear frightened or intimated by Upton, as Zeller noted defendant "stood his ground"; "yelled back"; "didn't retreat"; and continued to "do what he was doing." Zeller estimated there were two or three similar interactions between Upton and defendant while they lived adjacent to the lot.

Zeller testified that on March 21, 2013 (i.e., a week before the shooting), a sheriff's deputy came to their home. That day, Zeller heard Upton and defendant arguing. They were standing about 15 to 20 feet apart. Zeller recalled Upton yelling, "'Sheriff, can't you stop, (defendant)? What he does is not making any sense, he's cutting things down. He will never be able to build a road.'" Zeller heard defendant say in response, "'I can do whatever I want, it's my property. You won't stop me. Fuck you.'" Zeller noted Upton was also cussing. However, Zeller testified Upton did not threaten defendant, such as saying, "'I'm going to fucking kick your ass,'" or words to that effect.

In any event, while the sheriff's deputy was at the location on March 21, Zeller heard Upton tell the deputy, "'I will not touch (defendant), you do not need to worry, I promise you, I'm not stupid, I won't touch (defendant). You can go.'" [Footnote: The record shows the court, outside the presence of the jury, confirmed with both counsel they were each making a "tactical decision" to let in a great deal of hearsay evidence in the trial. Although the court offered to give the jury a limiting instruction, both counsel declined.]

After the sheriff's deputy left, defendant along with two of his workers continued for "hours" to cut down vegetation on the lot.

Zeller testified that, after they went back into the house following the March 21 incident, she reminded Upton that they were closing escrow in a few weeks on a new house; that they did not own the residence adjacent to the lot; and, thus, that it was not worth "getting worked up over" defendant's continued cutting of bushes and shrubs on the lot. A day or two later, Upton asked Zeller to inform defendant they were moving in two weeks. Although Zeller saw defendant working on his lot the next day, she did not speak to him because defendant made her uncomfortable.

Zeller testified that several months before Upton was killed, Upton showed her a gun. Until then, Zeller did not know Upton owned a gun. Zeller told Upton to get rid of it because she was afraid of guns.

On March 28, the day of the shooting, Upton awakened Zeller about 6:00 a.m. Because it was Zeller's birthday, Upton wished her a happy birthday and then told Zeller his mother had passed away in her sleep about three hours earlier after a long illness. Zeller testified Upton was relieved his mother had passed and his mood was happy, not somber.

About 9:00 a.m., as Zeller was walking up some stairs to talk to Upton, she heard two "loud and sharp bangs" that she estimated were about five to seven seconds apart. Initially, Zeller did not know they were gunshots. However, when she called out for Upton and got no response, she got a "doom feeling in (her) chest."

Zeller testified she went outside and saw defendant about 25 feet away talking on his phone. When Zeller asked defendant what those sounds were, defendant acknowledged her and then walked behind some bushes out of sight. Zeller next saw two workers defendant had hired running down the street. Zeller in Spanish yelled, "'What happened?'" One of the workers yelled back in English, "'I don't know, but it came from over there,'" while pointing up a path. When she walked up the path, Zeller saw Upton's body lying on the ground. A few seconds later, she heard defendant say, "'Don't get any fucking closer.'" When she looked up, Zeller saw defendant standing about eight feet away, pointing a "big revolver" at her. Defendant was holding a gun case in the other hand. Stunned, Zeller threw her hands into the air, waited, and then ran into the house.

Zeller testified that, as defendant pointed the gun at her, his demeanor was "very sharp and clear"; that he did not appear afraid or scared; that he did not show signs of being under "exorbitant stress"; and that, instead, he was "calm and composed." Zeller felt her life was then in danger. After running in the house, Zeller called 911.

Witness Macario Mendoza Matias testified that he was one of the two workers defendant had hired to work on the lot on March 28; that he had worked for defendant on the lot a week earlier; that, when they arrived at the lot about 8:30 a.m. on the day of the shooting, defendant told them he had a gun; and that defendant instructed him that if a person or dog came out of the house near where they were trimming the trees, defendant would go "'talk to them.'" Matias noticed defendant was carrying a black case. After defendant instructed them what to cut, defendant went a distance away, although Matias could still see defendant. Matias testified that, as he cut the tree branches, he was worried the branches would fall on the cars located nearby.

While working, a man later identified as Upton came out of the house and said "Hello" to Matias. Matias said the man had a little dog with him. The man next asked Matias if he intended to cut all the branches from the trees. After responding "'Yes,'" the man told Matias he was going to move the cars. According to Matias, the man was about 20 to 30 feet away when they had this short conversation. Matias testified the man was calm during their conversation; he was not yelling or cursing and did not seem angry. In addition, Matias did not see the man with anything in his hands.

Matias testified that the man next started walking up the hill, toward defendant. Matias heard the man say to defendant, "'Can you do me a favor.'" Matias further testified when the man made this statement to defendant, the man was neither yelling nor appeared angry. Instead, the man walked slowly. As Matias was cutting a branch, he heard a loud gunshot, which scared him. About seven seconds later, Matias heard another gunshot. Matias testified he and the other worker started walking away, looking behind them to make sure no one was coming, because they were afraid they also could be shot.

Witness Fredy Alva Rodriquez testified that he was the other worker at the lot on the day of the shooting; that he had never met Matias or defendant until that day; and that he saw defendant carrying a small black case that day. Rodriquez's job was to take the tree branches that had been cut up a dirt path, to a location beyond where defendant was standing. At some point, a man later identified as Upton came out of the house. Rodriquez testified the man did not appear angry, and he was neither yelling nor cursing.

18cv0433-L (AGS)

While on the dirt path carrying branches up the incline, Rodriquez went past the man about three times.  Rodriquez estimated he was about three feet away from the man each time he passed with the branches.  Each time Rodriquez passed, he noted the man was not yelling, nor did the man tell Rodriquez to stop what he was doing or ask him what he was doing there.  Instead, according to Rodriquez, the man just stood on the dirt path.

Rodriquez saw the man talking to defendant while on the path.  Rodriquez did not understand what they were saying because he does not speak English.  According to Rodriquez, the man did not appear angry while talking to defendant, nor was the man yelling or moving.  Defendant, however, was moving his hands side to side, as if he was "nervous."  Rodriquez also heard defendant say, "Fucking shit" while he was talking with the man.  Defendant, and not the man, appeared angry.  Rodriquez testified defendant was speaking louder than the man, and the man was "just listening."  Rodriquez did not see the man make any motions that suggested the man was going to attack defendant.

Rodriquez said he was about 10 feet away when defendant shot the man.  [Footnote: The record shows on cross-examination Rodriquez estimated he was about "75 feet" from where defendant and the man were arguing.  Rodriquez also recalled telling detectives he was about "100 to 150" feet from their location.  On redirect, Rodriquez testified that, from his location, he saw the man fall to the ground after being shot by defendant.  Although defendant complains Rodriquez was not credible, that was for the jury to decide, not this court.  (See *People v. Upsher* (2007) 155 Cal.App.4th 1311, 1322 (*Upsher*).)]  Rodriquez testified he saw the man fall backwards after the first shot.  According to Rodriquez, defendant fired a second shot at the man while the man was laying on the ground.  Rodriquez testified he also heard a third shot.

San Diego County Deputy Sheriff Jeremy Collis testified he responded to a call of shots fired at 9:06 a.m. on March 28.  The call to dispatch was made by defendant, who told dispatch he had "just shot his neighbor."  Deputy Collis and other sheriff's deputies contacted a man later identified as defendant.  About 50 yards away, Deputy Collis saw a person lying on a path.

San Diego County Deputy Sheriff Christopher Murray testified that he too responded to the call of shots fired.  When he arrived at the shooting scene, Deputy Murray saw a man later identified as defendant talking on his cell phone.  There was a black case on the ground next to the man.  Deputy Murray approached the victim, later identified as Upton, who was lying in a pool of blood face down on the ground.  Deputy Murray noticed a quarter-sized hole

18cv0433-L (AGS)

in the back of the victim's head. Deputy Murray did not observe any weapons near Upton's body.

San Diego County Deputy Sheriff Timothy Petrachek testified that he saw a man later identified as defendant standing in an "open field" waving as Deputy Petrachek arrived at the scene along with other deputies. Deputy Petrachek contacted the man. According to Deputy Petrachek, the man was calm and unanimated on contact and remained that way over the next 45 minutes to an hour while he was detained. The man also did not show any signs of injury. Deputy Petrachek subsequently arrested the man.

San Diego County Sheriff Homicide Detective Troy Dugal testified he observed two gunshot wounds on Upton, one to the head and another to the abdomen. Upton was lying on what appeared to be a "heavily-traveled" dirt path on the lot. Inside defendant's "box," Detective Dugal found a .44-caliber revolver, ammunition, a small video camera and condoms. On examining the revolver, Detective Dugal found four bullets and two empty casings, suggesting two shots had been fired from that weapon. Detective Dugal found the bullet that entered Upton's abdomen on the ground after they rolled him on his side; also found underneath the victim was a cellphone.

During the investigation, Detective Dugal found a "Glock 27 .40 caliber pistol" and a box of ammunition in the nightstand drawer inside the master bedroom of Upton's residence. No dirt, grass or vegetation or blood was observed on this pistol. Detective Dugal found six bullets in the magazine, but no bullets in the chamber. Detective Dugal determined the lack of a bullet in the chamber suggested the pistol had not been fired, because otherwise a bullet would have been loaded in the chamber as a result of the weapon being "semi-automatic." In addition, the box of ammunition contained 44 bullets, which, when added to the six bullets in the pistol, further suggested to Detective Dugal that the pistol had not been fired because typically a box of ammunition contained 50 bullets.

Computer forensic laboratory specialist Marion Lowe testified he analyzed defendant's computer, which was seized during a search of defendant's home in April 2013. Lowe obtained "positive hit(s)" for "'best pistol for skeet shooting'" from November 11, 2012; and "low-noise pistols" from October 8, 2011.

Firearm's Examiner Roland Chang testified the .44-caliber Rugar defendant used to shoot Upton was a "single-action" revolver, which meant the operator must manually cock the firearm and then pull the trigger for the

weapon to fire. According to Chang, the weapon would not fire if its operator continually pulled the trigger without manually pulling the hammer back. Chang determined the expended casings found at the shooting scene were fired from defendant's revolver.

## C. *The Defense*

Defendant testified in his own defense. After purchasing the lot in 2008, defendant initially tried to talk to Bonanno about extending the paved road to defendant's lot and, later, about the fact Bonanno had built a wall that encroached on defendant's lot.

Defendant met Upton and Zeller in 2011. Initially, their relationship was cordial. However, over time, their relationship soured. Defendant testified that he and Upton disagreed about politics. Upton also disagreed with defendant's decision to cut the trees and bushes growing on the lot. Upton also told defendant that Bonanno would never allow defendant to extend the paved portion of the road to defendant's lot.

Defendant testified he learned to shoot a weapon while in the Russian military. He described a "conflict" he had with Upton about a year before in what defendant described was the fatal "accident." In this instance, Upton became angry after defendant had cut some trees near their residence, along a fence line. Defendant testified he felt "verbally assaulted" because Upton was a "big man" with a "big voice" and because Upton's body language was "threatening."

When asked what made his body language "threatening," defendant stated Upton came out of the house and told defendant from about 12 to 15 feet away not to cut the trees because Upton wanted them for privacy. Defendant also stated that he was not concerned Upton would come closer during this conflict; and that, in response, he stopped cutting the trees on the fence line and moved to the main part of the lot to resume his cutting.

According to defendant, Upton also opposed defendant's cutting of the trees on the main part of the lot. Defendant testified that Upton allegedly confronted him about the tree cutting about once a week; that when Upton would do so, he was "hostile"; that Upton showed his hostility through his "body language" and from the "tone" of his voice; and that, although Upton never actually threatened defendant, such as saying he would "kill" defendant, defendant nonetheless felt threatened. As Upton's hostility toward defendant increased, defendant became concerned Upton would "snap." Upton also

began cursing at defendant, calling him a "'fucking Russian'" when asking defendant if he would ever stop cutting down the trees.

Because of Upton's hostility, defendant testified he called the sheriff's department and complained his neighbor was not allowing him to cut trees and bushes on the lot or to walk on portions of the lot that were near his neighbor's residence. Because Upton's hostility toward defendant was escalating during these weekly confrontations, as noted defendant purchased two guns to protect himself from Upton. [Footnote: Defendant told detectives during a stationhouse interview that he purchased the .44 revolver because he had researched handguns and determined the .22 semiautomatic pistol was too "small" and because he was concerned he might not be able to shoot Upton in the head with such a small weapon.]

Defendant recalled the telephone conversation with Deputy Hill. Defendant testified that, during their October 2012 telephone call, he told Deputy Hill that Upton was "'yelling'" at, and "'angry'" with, him. Because Upton had not made a "'specific threat,'" which defendant described as a "'promise'" to kill or break defendant's "'neck'" or "'legs,'" Deputy Hill told defendant it was a "property dispute" and there was nothing the sheriff's department could do. Defendant also recalled telling Deputy Hill he had purchased a handgun to "protect (himself) from the neighbor" and asking the deputy if there were any "local," as opposed to "state," laws that prevented defendant from carrying the weapon on his own property.

Defendant testified that, about a week after this conversation, he approached two deputies who were outside of his apartment; and that he wanted to speak with the deputies because his telephone conversation with the sheriff's department a week earlier had provided no answer to his request for help with his neighbor and to his question about whether he was permitted under "local" law to carry a weapon while on his property. It was then Deputy Hill identified himself as the sheriff's deputy defendant had spoken with. According to defendant, Deputy Hill merely repeated what he had told defendant a week earlier.

In a confrontation that took place in October 2012 while defendant was shoveling some dirt to smooth the road, Upton approached, told defendant to stop work and said he needed a permit to fix the road. Although it was dark, defendant claimed he saw Upton holding a "short black pistol" in his left hand. At the time, Upton was about 30 feet away from defendant. Defendant testified when he saw Upton with the pistol he felt "something serious" was happening. However, defendant did not call law enforcement because he

18cv0433-L (AGS)

believed Upton had a right to carry a gun on Upton's "rented property" and because Upton had not made a specific threat against, including pointing the gun at, defendant.

Defendant in his testimony confirmed he had conducted between 22 and 50 searches on the internet regarding firearms, including low-noise pistols. Defendant testified he was interested in buying such a weapon because coyotes were "running on his property," and, if he needed to shoot one, he did not want to alarm the neighbors. Defendant found no such pistols were available.

Defendant testified he carried the .44-caliber revolver with him "all the time" when he was on the lot. Defendant stated he kept the revolver in a gun case, fully loaded with ammunition to hunt "'deer and bear.'" Defendant also had a video camera in the gun case to record Upton if he did "something" to defendant.

Defendant testified he showed Sampo the revolver because if Upton did "something dangerous" during the survey, defendant needed to be prepared to "interfere, with a weapon." Defendant told Sampo he needed the revolver for "self-protection."

Defendant testified that, despite Upton's protests, he continued to remove the trees and bushes from the lot because they posed a fire hazard and because he wanted to plant some fruit trees. Between January and March 1, 2013, Upton continued to confront defendant about once a week while defendant was working on the lot. According to defendant, Upton's behavior during this period was getting worse because Upton knew defendant had hired a surveyor and because defendant told Upton he was going to tear down the wall Bonanno had built years earlier that encroached on his lot.

On March 21, 2013, defendant called the sheriff's department after the surveyor told defendant some brush located near Upton's residence needed to be removed to complete the survey. Defendant testified that he was present during a portion of the contact between Deputy Abbott and Upton; that Upton asked the deputy if it was legal for defendant to cut the bushes; and that Deputy Abbott told Upton it was legal because the bushes were on defendant's property. In response, Upton told the deputy, "'I'm pissed he's cutting everything. He's destroying the neighborhood.'" Also angry, defendant tried to defend himself from these accusations. Defendant estimated Deputy Abbott stayed about 20 minutes, and, when the deputy left, things were calm between defendant and Upton.

The day before the shooting, defendant nailed a sign to a large tree near Upton's residence that read, "'No parking on the 30 feet road.'" Defendant put the sign up because the following day he intended to cut the bushes and trees in the same area where Upton and Zeller typically parked their cars. The following day when defendant arrived with two workers to remove the bushes and trees, he saw the sign was gone and there were cars parked in the same area in which he intended to work.

Before starting work on the day of the shooting, defendant testified he told both workers he had a "bad neighbor" who was "hostile" and that, if something happens, for the workers not to get involved but to come to him and he would "deal with it." The workers started cutting around 8:30 a.m. Defendant stood near a fence line in the "middle" of the lot because he was afraid of Upton. Defendant testified that he was "guarding" the workers who were cutting the trees near Upton's residence; that he was "hiding" from Upton because he was concerned Upton would get upset because of where they were cutting; and that Upton might do something "very dangerous."

A few minutes later, defendant observed Upton "peeking" out the front door. Concerned, defendant in response opened the gun case that he was holding and put the revolver in his waistband. Defendant next covered the gun with the long-sleeve shirt he was wearing. Defendant testified he then decided to carry the revolver on his person because the workers were cutting trees that were close to Upton's front porch.

About five or 10 minutes later, defendant saw Upton step outside and heard him speak to the workers. Defendant testified that he saw Upton with "something" in his right hand; and that he heard Upton ask, "'Are you going to cut these trees?'" and inquire whether the workers wanted him to move the cars parked nearby. After the workers responded, defendant heard Upton say, "'Give me a few minutes.'" At that point, Upton started slowly walking in the direction of defendant.

Defendant testified as Upton slowly approached, he cocked the revolver while it was still in his waistband because Upton was looking at some tools lying on the ground, including an axe. As Upton came nearer, he started yelling at defendant "'Get the fuck out of here'" and "'This is not your land.'" Defendant responded, "'Are you kidding, this is my land, I will not leave.'" When Upton was about 10 feet away, defendant testified he saw Upton had a pistol in his right hand that was pointed downward. Defendant in response pulled out his revolver and shot Upton.

Defendant testified he shot Upton because he was in fear for his life. Before firing the second shot at Upton's head, defendant yelled "'Stop.'" Defendant fired the second shot at Upton's head because Upton continued to walk towards him; he was not sure if Upton had been hit by the first shot, although he doubted he had missed (ostensibly in light of his military training); and that it then went through his mind Upton might be wearing a "bullet(-proof) vest." [Footnote: During a stationhouse interview, defendant stated that, when he fired the second shot at Upton's head, Upton was either in the process of falling from the first shot or was trying to "avoid" the second shot. Again, any discrepancy in a witness's testimony was a matter for the jury. (See *Upsher*, *supra*, 155 Cal.App.4th at p. 1322.)]

In shock, defendant next saw Zeller. Initially, she spoke with the workers, then approached defendant and asked, "'What have you done?'" Defendant testified he responded, "'Do not approach me'" as he pointed the revolver at her in a downward direction, "not to (her) head or chest." Defendant further testified when he pointed the revolver at Zeller, it was not to instill "fear" in her but rather to impart "knowledge" of its existence to ensure she would not approach him. [Footnote: When asked on cross-examination why defendant did not show Upton the gun as he had done with Zeller, defendant stated it was against the law to brandish a weapon and he would have been arrested. When asked why defendant did not shoot a warning shot in the air as Upton approached, defendant stated that too was against the law. Defendant admitted that, when he spoke to the 911 operator after shooting Upton, he never mentioned that he saw Upton with a gun. When asked why he also did not inform sheriff deputies responding to the shooting that Upton had a gun, defendant testified he assumed they would "find (it) themselves."]

Defendant next walked to the main part of the lot and called 911. The recording of the 911 call was played for the jury. During this call, defendant told the 911 operator that his neighbor had "assaulted" him, and, thus, he shot his neighbor. As defendant waited for law enforcement, he put the revolver back into the gun case.

Witness Jesse Owens testified that he conducted the survey of the lot on March 21, 2013; that, at some point in the morning, Deputy Abbott arrived and escorted them to a particular area where some of the work was to be performed; that he was present when Deputy Abbott contacted Upton; that Upton was "very angry with the whole situation"; but that defendant was calm. Owens noted Upton was cursing and screaming and told defendant, "'Get the fuck away from me.'"

Owens estimated Upton was screaming for about 15 minutes. However, Owens overheard Upton tell Deputy Abbott that he was not going to hurt defendant, saying he was not "go(ing) down that path." According to Owens, Deputy Abbott explained to defendant what was considered a "legal threat." Based on that definition, Owens testified Upton did not threaten defendant during this confrontation.

Witness Duane Byram testified that he was formerly married to Zeller; that he first met Upton in January 2011; and that he had various "encounters" with Upton in 2011 and 2012, which turned out to be "negative experiences." In one such encounter in May 2011, Byram drove to Upton's residence to pick up his children. As he approached the house, Upton came outside and started yelling at Byram for about 30 or 40 seconds to "get away from his house" and to get the "fuck back to (Byram's) car." Byram went back to his car and waited there until the children came outside. Byram testified he had no idea why Upton came at him like that, as there had been no animosity between them up to that point.

In another incident that took place in June 2012, Byram described how he was leaving Upton's residence when he saw a car coming in the opposite direction. Because the road was narrow and a single lane, Byram pulled off to the side to let the other car pass. As the other car approached, Byram realized Upton was driving. According to Byram, Upton pulled in front of him, blocking him from leaving, and started mouthing some words while pointing at Byram in a "menacing way." Byram testified he was fearful of, and upset with, Upton, particularly because Byram's children were in the car.

In another encounter that took place in about July 2012, Upton and Byram saw each other at a restaurant. According to Byram, when they shook hands Upton repeatedly said, "It doesn't have to be like this" while at the same time refusing to let go of Byram's hand. Byram estimated Upton aggressively shook his hand for about 30 seconds.

Byram also described other incidents, including one in October 2012 when Byram was talking to his former mother-in-law in front of Upton's residence. In that incident, Upton pulled his car behind Byram, who was dropping the children off for the weekend. As Upton approached Byram's car, he pushed Zeller's mother out of the way, came right up to Byram's car window, and started yelling and cursing at Byram for about a minute and a half.

### D. *Rebuttal*

Witness Carmen Warner-Robbins testified that she met Upton in 1995; that he worked with her on creating a video about women who were once incarcerated and had returned to living productive lives; and that, while he was "passionate" and "strong in his beliefs," he was neither violent nor a bully. Detective Hillen testified he interviewed defendant for more than two hours after the shooting. During the interview, defendant never told the detectives that he told Upton to stop as Upton approached, immediately before defendant shot Upton. Defendant also did not mention to detectives that he told Upton to stop a second time before he fired the second shot. Defendant also admitted to detectives during the interview that he pointed the gun at Zeller, as opposed to the ground, as he testified at trial. Finally, Detective Hillen confirmed that, although defendant was "very forthright with information" during the interview, he then never mentioned ever seeing Upton with a gun before the March 28 shooting.

(Lodgment No. 7, <u>People v. Vilkin</u>, No. D067753, slip op. at 3-26.)

## III. PETITIONER'S CLAIMS

(1) Petitioner claims he received ineffective assistance of counsel when his trial counsel failed to move for a mistrial after the prosecutor, during cross-examination, asked a defense expert on the fight-or-flight syndrome whether the expert had previously said outside the presence of the jury that its use as a defense strategy was a "fad." (Pet. at 6.)

(2) The jury instruction on contrived self defense, which provided that a person does not have a right to self defense if they provoked a fight with the intent to create an excuse to use force, allegedly violated federal due process by depriving Petitioner of a meaningful opportunity to present a complete defense because it was not supported by the evidence, as it required evidence of wrongful conduct whereas Petitioner engaged in legal conduct cutting trees and brush on his own property. (<u>Id.</u> at 7.)

(3) Petitioner claims he received ineffective assistance of counsel due to his trial counsel's failure to object to the contrived self defense instruction on the basis that it was not supported by the evidence. (<u>Id.</u> at 8.)

(4) The cumulative effect of the instructional error and defense counsel's ineffective assistance allegedly prejudiced Petitioner. (<u>Id.</u> at 9.)

## IV. **DISCUSSION**

For the reasons set out below the Court finds federal habeas relief is unavailable because the state court adjudication of Petitioner's claims was neither contrary to, nor an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The Court recommends the Petition be denied.

### A. Standard of Review

In order to obtain federal habeas relief with respect to a claim which was adjudicated on the merits in state court, a federal habeas petitioner must demonstrate that the state court adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2006). Even if § 2254(d) is satisfied, a petitioner must still show a federal constitutional violation occurred in order to obtain relief. Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in our cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407.

"[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, 572 U.S. 415, 427 (2014), quoting Harrington v. Richter, 562 U.S. 86, 103 (2011). In order to satisfy

§ 2254(d)(2), the petitioner must show that the factual findings upon which the state court's adjudication of his claims rest are objectively unreasonable.  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

### B.    Claim One

Petitioner alleges in claim one that he received ineffective assistance of counsel when his trial counsel failed to move for a mistrial after the prosecutor asked a defense witness, an expert on the fight-or-flight syndrome, whether the expert had previously said that its use as a defense is a "fad."  (Pet. at 6.)  During a California Evidence Code 402 hearing outside the presence of the jury to determine if Dr. Raymond Murphy, a psychologist, would be permitted to testify regarding the fight-or-flight syndrome, Dr. Murphy said he had previously testified in court five or six times on the fight-or-flight syndrome during his 38-year career.  (RT 255.)  Dr. Murphy was asked by the prosecutor for a timeframe as to when those five or six times occurred, and the following exchange took place:

> A.  Gosh, you're asking for guesses . . . um, probably ten years . . .  I think things like fight-or-flight go through fads in terms of testimony on them.
>
> Q.  Are we in a fight-or-flight fad now?
>
> A.  I think so, yes.
>
> Q.  And what makes you say that?
>
> A.  Well, I've had a number of requests for information on fight-or-flight, or possible testimony on fight-or-flight.

(RT 256-57.)

Defense counsel asked Dr. Murphy: "You didn't mean to suggest that fight-or-flight is somehow not a legitimate syndrome by suggesting it's a fad?", and he replied:

> Oh, no, not at all.  I think my implication was that defense strategies change.  And at one point there were a lot of issues around fight-or-flight, just like at one point in my career there was a great deal of issues around what was called child sexual abuse accommodation syndrome.  That went out of fad for

15, almost 20 years, and recently it's been resurrected. And I've seen, you know, issues of consults regarding child sexual abuse accommodation syndrome and how children talk about what happened and how they delay and things like that. So I think defense strategies change, just like psychological principles change.

(RT 264-65.)

The trial judge ruled that Dr. Murphy would be allowed to testify. (RT 269.) On direct examination by defense counsel in front of the jury at trial, Dr. Murphy was asked: "Is fight-or-flight something that comes up, in your experience, very often in your experience with criminal trials involving violence?", and he responded: "It has. More recently than, say, in prior years, but it appears to go through various phases of acceptability." (RT 1195.) The following exchange took place while the prosecutor was cross-examining Dr. Murphy:

> Q. You mentioned phases of acceptability when you were describing whether—or how this defense is being used currently. Is that what you meant—you were saying "Phases of Acceptability"?
>
> A. Yeah, I think so.
>
> Q. And I believe you previously even termed it as a fad?
>
> A. Fad in the sense of a defense strategy.

(RT 1204.)

As set forth in detail below, the trial judge halted the questioning at that point and instructed the jury that the prosecutor's question about fight-or-flight being a fad defense was inappropriate and they were to disregard it and Dr. Murphy's answer. (RT 1205.)

Petitioner argues that the denigration of the fight-or-flight syndrome as a fad weakened his defense because he needed it to show that his "numerous intimidating prior encounters with Upton would have caused [him] to be hypervigilant when he encountered Upton on the day of the incident, and to incorrectly perceive a cell phone Upton was carrying to be a gun." (Pet. at 6.) Respondent answers that the denial of the claim by the

state court, on the basis that Petitioner had not shown deficient performance because counsel made a strategic decision not to request a mistrial, nor prejudice because a mistrial motion would have been denied, is neither contrary to nor an unreasonable application of clearly established federal law, and does not involve an unreasonable determination of the facts. (Ans. Mem. at 19-24.) Petitioner replies that the presumption a jury follows their instructions, and the presumption trial counsel had a strategic reason for not seeking a mistrial, are rebutted because it would be difficult for the jury to ignore testimony from the defense's own expert that the defense is a fad. (Traverse at 6-7.) Petitioner argues that the only reasonable action for defense counsel was to move for a mistrial, and the failure to do so was prejudicial because the record strongly supports a finding that a mistrial would have been granted. (Id. at 7-9.)

Petitioner presented this claim to the state supreme court in a petition for review (Lodgment No. 8 at 13-16), which was denied with an order which stated: "The petition for review is denied." (Lodgment No. 9.) It was presented to the appellate court on direct appeal (Lodgment No. 4 at 39-49), and denied in a written opinion. (Lodgment No. 7.)

There is a presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991). The Court will look through the silent denial by the California Supreme Court to the appellate court opinion on direct appeal, which stated:

> Defendant contends he was denied effective assistance when defense counsel failed to seek a mistrial after the prosecutor and the defense expert referred to the "fight or flight" syndrome as a "fad." We disagree.
>
> 1. Additional Background
>
> Pretrial, the prosecution moved to exclude the testimony of Dr. Raymond Murphy, arguing Dr. Murphy did not possess the requisite expertise to testify on a "fight or flight" theory; the basis of his opinion was exclusively derived from the hearsay statements of defendant, as Dr. Murphy did not interview defendant; and the issue of "fight or flight" was not outside the common knowledge of the jury. The record shows the court set an Evidence

Code section 402 hearing. Following that hearing, the court denied the prosecution's motion.

At trial, Dr. Murphy generally testified about "fight or flight," noting that it "allows (an) individual to prepare for a dangerous situation, and to either fight to preserve themselves, or flee"; that chemicals in the body are released, including adrenaline and norepinephrine in such situations; that no thinking is required, but rather it is an "automatic response by the nervous system"; and the "fight or flight" response is based on an individual's life experiences. Dr. Murphy noted there was no test he could have performed on defendant to determine whether defendant was undergoing "fight or flight" response on the day Upton was shot. However, Dr. Murphy noted that, if a person was operating under a "fight or flight" response, it was possible for that person "to perceive or see something—a threat, a danger—that may not actually be there" for "survival."

During cross-examination, Dr. Murphy confirmed he was not testifying that defendant was undergoing a "fight or flight response at any given time," including when he shot Upton, because "there's no test for it." Dr. Murphy further confirmed he had not spoken to defendant, he had not read any police reports and he had not read any of defendant's statements. According to Dr. Murphy, an individual under a "fight or flight" response may show symptoms of sweating, palpitations, stuttering, crying and screaming, among other reactions. Conversely, the lack of such symptoms—including perhaps an individual's calmness, as Zeller and Deputy Petrachek observed of defendant *immediately* after the shooting—suggested an individual might not be experiencing "fight or flight."

In any event, as particularly relevant to the instant issue, the following exchange occurred during Dr. Murphy's cross-examination:

"Q. (By the prosecutor): You mentioned phases of acceptability when you were describing whether—or how this defense is being used currently. Is that what you meant—you were saying 'Phases of Acceptability?'

"A. (By Dr. Murphy): Yeah, I think so.

"Q.: And I believe you previously even termed it as a 'FAD?'

"A.: 'FAD' in the sense of a defense strategy.

"Q.: One of the other things you talked about as far as contextual, is that if one has a knowledge or familiarity with a dangerous location—

"The Court: Let me see counsel at side-bar."

The record shows, after the unreported side bar, the court admonished the jury as follows:

"All right, ladies and gentlemen, there was a question asked as to whether or not this was considered a FAD.

"A FAD can have different contexts, it can have *different meanings*. What I am telling you is that the context within which it was used in this case was inappropriate. That was an inappropriate question for the People to ask, and it gave an inappropriate—left an inappropriate impression with the jury. Therefore, you are to disregard that question, you are to disregard the answer, and you're not to consider it in any way in your considerations of this case." (Italics added.)

Outside the presence of the jury, the following discussion occurred:

"The Court: All right, we did have a discussion off the record where I indicated to counsel I believe that was a motion in limine the court had previously ruled on, that we were not going to be using that terminology. That counsel could, if he wished, inquire as to recency, or the times under which the defense is presenting itself, but not to refer to it as a 'FAD.' (¶) (Defense counsel), do you wish to address anything further on your redirect, or do you wish to leave it as it is?

"(Defense counsel): Your honor, at this point I'll leave it as it is. Your honor has, I believe, adequately told the jury to disregard it. (¶) I may ask a follow-up on redirect about: (¶) fight or flight has always existed scientifically, it just—the frequency from which it's used, can vary from year to year, decade to decade—or some such thing.

"The Court: All right. And I think that would be appropriate for you to do."

Next, the prosecutor stated he did not purposely disregard the court's ruling on the use of the "fad" terminology. In response, the court told the prosecutor that the question was inappropriate and that the prosecution was

not to "denigrate" any of the defense's defenses.  The following exchange then took place:

"(The Prosecutor): My use of that terminology was not meant as an insult to either counsel or the court.

"The Court: I understand that. It was the *witness* (at) the [Evidence Code section] 402 hearing *who used that term to begin with*, but the point remains relevant: you're not to be doing that in that fashion.  All right.  (¶)  So (defense counsel), you believe that it has, or will be, effectively dealt with?

"(Defense counsel): Yes, your honor." (Italics added.)

2. <u>Guiding Principles and Analysis</u>

"Defendant has the burden of proving ineffective assistance of counsel. (Citation.)  To prevail on a claim of ineffective assistance of counsel, a defendant '"must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice."' (Citation.)  A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  (Citation.) Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. (Citation.)  To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. (Citation.) Moreover, prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.' (Citation.)" (*People v. Maury* (2003) 30 Cal.4th 342, 389 (*Maury*).)

"'Reviewing courts defer to counsel's reasonable tactical decisions . . ., and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."'  (Citation.)  '(W)e accord great deference to counsel's tactical decisions' (citation), and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight.'"  (*People v. Weaver* (2001) 26 Cal.4th 876, 925–926 (*Weaver*).)

"'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. (Citation.) Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. (Citation.) Accordingly, it would be a rare case in which the merits of a mistrial motion were so clear that counsel's failure to make the motion would amount to ineffective assistance.'" (*People v. Jennings* (1991) 53 Cal.3d 334, 380 (*Jennings*).)

Here, defendant can neither establish that defense counsel was deficient for failing to bring a mistrial motion based on the use of the word "fad" nor that he suffered prejudice as a result of the alleged deficiency.

First, we note from the record that it was defendant's own expert, Dr. Murphy, who introduced the word "fad" in connection with his testimony at the Evidence Code section 402 hearing regarding the "fight or flight" response.

Second, although the trial court found the use of the word "FAD" inappropriate, we conclude the meaning of this word, when viewed in context, was at best ambiguous. Indeed, the Merriam-Webster online dictionary defines "fad" to mean: "something (such as an interest or fashion) that is very popular for a short time" (http://www.merriam-webster.com/dictionary/fad (as of August 30, 2016)). However, Dr. Murphy testified the recognition of the "fight or flight" syndrome or response was made in the early 1900's, suggesting this syndrome or response was anything but a "fad."

Third, in any event, the word "fad" was used only twice within a few seconds of each other, and, immediately after it was used, the court halted the proceedings, went to a side bar and then promptly admonished the jury that the word can have different meanings depending on the context—a point we agree with, as noted—and that it was to disregard the question and the answer in which the word was used. We conclude the trial court properly exercised its broad discretion in handling this issue and when it offered the defense an opportunity to address the issue on redirect. (See *Jennings*, *supra*, 53 Cal.3d at p. 380 (noting the general rule that it is a "'rare case in which the merits of a mistrial motion were so clear that counsel's failure to make the motion would amount to ineffective assistance'").)

Fourth, we conclude defense counsel made a reasonable tactical decision then to "leave (the 'fad' issue) as it is" because counsel believed the court had adequately addressed it with the jury when the court instructed the

18cv0433-L (AGS)

jury to disregard the question and answer using the word. (See *Weaver*, *supra*, 26 Cal.4th at pp. 925–926 (noting that, as a court of review, we "'accord great deference to counsel's tactical decisions' (citation), and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight'").)

On this record, we conclude that, even if defense counsel had made such a motion, it would have been denied. (See *People v. Memro* (1995) 11 Cal.4th 786, 834 (noting the general rule that counsel is not obligated to make futile or frivolous motions).)

(Lodgment No. 7, <u>People v. Vilkin</u>, No. D067753, slip op. at 39-46.)

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set out in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>See</u> <u>Baylor v. Estelle</u>, 94 F.3d 1321, 1323 (9th Cir. 1996) (stating that <u>Strickland</u> "has long been clearly established federal law determined by the Supreme Court of the United States.") For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must show that counsel's performance was deficient. <u>Strickland</u>, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> Petitioner must also show that counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." <u>Id.</u> To show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. <u>Id.</u> at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u> Petitioner must establish both deficient performance and prejudice to establish ineffective assistance of counsel. <u>Id.</u> at 687.

"Surmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "The standards created by <u>Strickland</u> and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so." <u>Richter</u>, 562 U.S. at 105 (citations omitted). These standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt." <u>Cullen v. Pinholster</u>, 563 U.S. 170,

181 (2011).  "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." <u>Richter</u>, 562 U.S. at 110, quoting <u>Strickland</u>, 466 U.S. at 686.

The Court finds that it was objectively reasonable for the state court to find that Petitioner did not surmount <u>Strickland</u>'s high bar as to either prong.  With respect to performance, the state appellate court found defense counsel made a tactical decision not to move for a mistrial.  After the jury was admonished, the trial judge asked defense counsel: "Do you wish to address anything further on your redirect, or do you wish to leave it as it is?"  (RT 1206.)  Counsel replied:

> Your Honor, at this point I'll leave it as it is.  Your Honor has, I believe, adequately told the jury to disregard it.  I may ask a follow-up on redirect about: fight or flight has always existed scientifically, its just – the frequency from which it's used, can vary from year to year, decade to decade – or some such thing.

(<u>Id.</u>)  The trial judge replied "that would be appropriate."  (<u>Id.</u>)

The entire re-direct examination of Dr. Murphy by defense counsel consisted of the following exchange:

Q.  Just briefly.  Just to make sure something is cleared up, Dr. Murphy:  This fight-or-flight syndrome we've been talking about, it's an accepted, valid phenomenon; is that fair to say?

A.  Yeah, I think so.  It's a physiological response that can be validated.  You can't necessarily see it –

Q.  Right.

A.  – but you can measure it.  For example, blood pressure, pupillary response, heart rate, breathing rate, the presence of high levels of hormones in the system, such as epinephrine norepinephrine, cortisol.  You know, so it can be measured.

Q.  Okay.  And it's been studied, as you mentioned, or as you testified, for almost a hundred years?

A.  That's right.

Q.  Okay.  Finally – or almost finally – the frequency that fight-or-flight syndrome is used in criminal trials over the course of your 38 years, have you seen that there are times when it's not used as much, it varies in frequency?

A.  Like patterns of use?

Q.  Yes.

A.  Yeah, sure.

Q.  But that doesn't minimize or mitigate the fact that the phenomenon exists?

A.  Oh, no, probably has nothing to do with the phenomenon itself.

Q.  And finally, [the prosecutor] was asking you about officer-involved shootings, and how this fight-or-flight syndrome in officers, who had training, can actually empty their weapons while under the effect of this fight-or-flight syndrome – you've heard of that?

A.  I have.

Q.  And same thing, officers experiencing fight-or-flight syndrome had shot and killed people they thought had weapons that, in fact, did not?

A.  I've heard of that too.

(RT 1211-13.)

During closing argument defense counsel argued that Upton was a large aggressive man who had instilled fear in Petitioner over an eight-month period.  (RT 1440-41.)  He then argued the fight-or-flight syndrome "kick[ed] in" when Upton confronted Petitioner, which explained his shooting Upton and pointing the gun at Zeller, as well as any contradictions in Petitioner's statements afterward, and argued that the instructions on self-defense were satisfied even without consideration of the fight-or-flight syndrome.  (RT 1457-71.)  The prosecutor on rebuttal stated:

> [Petitioner's] not afraid.  This isn't fear.  This isn't legitimate self-defense.  This is fabricated, this is contrived, this is fake so that he can get away with his exit strategy.  That is the exit strategy, to blame John Upton; it is John Upton's fault, it is John Upton's doing.  That's not the case.  [¶]  What

29

fight or flight? There was none. You heard there are no tests for it, there might be symptoms for it, there might not be symptoms for it, somebody could tell you they're afraid, they might be lying to you. What are you supposed to do? You look at the objectives, you look at the circumstances. He's not exhibiting any symptoms, nothing. [¶] Whereas, what are Evelyn and James, Evelyn Zeller and James Upton, exhibiting? [¶] And how are you going to distinguish between whether this is, if he's feeling any sort of physiological response, generated from fear or generated from the rush of just having killed John Upton? From that . . . as Dr. Murphy talked about, how you get that rush from illicit behavior when you're doing something that you know you're not supposed to be doing. [¶] Where is the test for that? Which defense is it? Which is it? [¶] None of them work here. [¶] He's grasping at straws, none of them are reasonable here, because of everything that you know about this case, because of all the different ways defendant laid this groundwork, laid this plan, the whole point of having anybody out there on March 21st, any of the deputies out there on March 21st, was so that there would be some sort of documentation of John Upton yelling, which there was, but that's it. [¶] I'm saying, again, that this plan wasn't foolproof. John Upton knew where to draw the line. He was capped, he was measured. Just like Jesse Owens told you, he wasn't going to cross that line into physical violence. And so this self-defense had to be stepped up, it had to be fabricated some more, with talk of fake guns, with talk of fake fear. [¶] It's not typical – it's not like you see on television, this isn't just a drama. This is real life. And in this real-life situation, this defendant plotted and tried to get away with murder under this false self-defense theory.

(RT 1476-77.)

Petitioner claims defense counsel was deficient in accepting as adequate the trial judge's admonition to the jury to disregard the prosecutor's denigration of the fight-or-flight syndrome, arguing that the syndrome "went to the heart of the defense and provided an explanation on what was otherwise something that would have been difficult to explain, namely why someone might mistake a cell phone for a gun." (Traverse at 7.) He argues this is one of those rare exceptions to the presumption that the jurors followed their instruction to ignore the testimony because it was the defense's own expert who said the syndrome is a fad and "appeared not to give it full weight or credence." (Id.)

Petitioner must overcome a "heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy." Matylinsky v. Budge, 577 F.3d

18cv0433-L (AGS)

1083, 1091 (9th Cir. 2009). The trial judge gave a very strong admonition to the jury to disregard the characterization of the fight-or-flight syndrome as a fad:

> A fad can have different contexts, it can have different meanings. What I am telling you is that the context within which it was used in this case was inappropriate. That was an inappropriate question for the People to ask, and it gave an inappropriate—left an inappropriate impression with the jury. Therefore, you are to disregard that question, you are to disregard the answer, and you're not to consider it in any way in your considerations of this case.

(RT 1205.)

Defense counsel then went even further and clarified, on the re-direct examination of Dr. Murphy, that the fight-or-flight syndrome has been studied "for almost a hundred years," and that although over the course of his 38 years' experience in criminal trials "it varies in frequency," it has been used to explain shooting behavior of unarmed people by police officers. (RT 1212-13.) Defense counsel argued to the jury that the shooting was self-defense due to the history of threatening behavior by Upton, and to the extent the jury had any issue with Petitioner's conduct as seeming to be at odds with self-defense, it could be explained by the fight or flight syndrome. (RT 1457-71.) Further, although the prosecutor argued in rebuttal that the evidence did not support a finding Petitioner was actually acting under the fight-or-flight syndrome, he did not argue the syndrome itself was an invalid defense. (RT 1476-77.)

Petitioner has failed to show defense counsel acted unreasonably in the manner he handled the prosecutor's question and Dr. Murphy's response, and the record supports the finding by the state court that defense counsel made a reasoned tactical decision not to seek a mistrial. In addition to the reasons identified by the state court as to why the actions counsel took were reasonable, counsel may not have not wanted a mistrial, but may have perceived the trial as going well and the jury favorable as empaneled, which is supported by the fact they deliberated four days. And counsel may have thought a new trial could favor the prosecution since Petitioner had already testified when the issue arose. Even assuming, for purpose of argument, that Petitioner is correct that requesting a mistrial

would have been a reasonable tactical decision, it does not support a finding of deficient performance. See Strickland, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.") Accordingly, the state court finding of lack of deficient performance is objectively reasonable. Richter, 562 U.S. at 105 ("The standards created by Strickland and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so."); see also Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) ("[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.")

The state court's rejection of this claim was also reasonable on the basis that Petitioner failed to demonstrate prejudice. See Strickland, 466 U.S. at 687 (holding that both prejudice and deficient performance must be shown in order to establish constitutionally ineffective assistance of counsel). As set forth above, the state court found no prejudice because it was defense counsel's own witness who made the statement, because the word fad was used in a manner which was ambiguous at best, and because the jury was immediately admonished after the word was used (only twice) within a few seconds. Petitioner replies that "[o]nly a mistrial would have assured that the 'fad' evidence had no impact on the jury." (Traverse at 7.) Even if the Court were to assume the brief use of the word had an impact on the jury, the standard for prejudice is whether there is a reasonable probability a different outcome arising from the introduction of the evidence would have happened, that is, "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 112.

Consequently, even if the ambiguous reference to "fad" could have been interpreted by the jury as an attempt by the prosecutor to denigrate the use of fight-or-flight syndrome as a defense, or as a failure by Dr. Murphy to "give it full weight or credence," any taint was cured by the trial judge's strong and immediate admonition to the jury, by defense

counsel's clarifying re-direct examination of Dr. Murphy, and by counsel's comments during closing argument where the fight-or-flight syndrome was characterized by defense counsel as supplemental to the defense of self-defense. The Court rejects Petitioner's contention that this is an instance where the jury should not be presumed to have followed their instruction to ignore the question and answer. See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985) ("The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, makes sense of, and follow the instructions given them.") That presumption may be overcome where there is "a strong likelihood that the effect of the [error] would be devastating to the defendant." Greer, 483 U.S. at 766 n.8. In light of the steps the trial judge and defense counsel took to address the issue, Petitioner has not shown his defense was compromised in any way by the brief and rebutted reference to the fight-or-flight syndrome as a fad. Nor has he shown a substantial likelihood of a different outcome had defense counsel sought a mistrial. In addition to the reasons given by the state court as to why the steps taken to cure any taint were reasonable, defense counsel may not have wanted a mistrial, as one might favor the prosecution since Petitioner had already testified, and may have thought the trial was going well with favorable jurors as shown by the fact that the jury deliberated five days.

The Court finds the state court reasonably denied claim one on the basis that Petitioner failed to allege facts which, if true, demonstrated ineffective assistance of trial counsel or any prejudice as a result of the allegations. See Richter, 562 U.S. at 105 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.") Accordingly, the Court finds that the state court adjudication of claim one was neither contrary to, nor an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

/ / /

## C.     Claim Two

Petitioner alleges in claim two that the trial court erred in instructing the jury with a contrived self defense instruction which stated: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." (Pet. at 7.)  He contends that because the instruction was not warranted by the evidence it undermined his defense of self-defense, thereby depriving him of a meaningful opportunity to present a complete defense. (Id.)

Respondent answers that the instruction was properly given because it was supported by evidence that Petitioner lured the victim into a confrontation. (Ans. Mem. at 24-32.) Petitioner replies that as a matter of law the evidence was not sufficient because evidence of wrongful conduct is required to support the instruction, whereas he engaged in conduct he was legally entitled to perform, trimming trees and brush on his own property. (Traverse at 9-17.)

This claim was raised in the petition for review and summarily denied by the California Supreme Court. (Lodgment Nos. 8-9.)  The claim was also presented to the appellate court on direct appeal and denied in a reasoned opinion. (Lodgment Nos. 4-7.) The Court will look through the silent denial by the state supreme court to the appellate court opinion, which states:

> Defendant next contends his counsel was ineffective when the defense failed to object to CALCRIM No. 3472.  This instruction, as given, provides, "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."  Defendant contends this instruction was improper because there allegedly was "no evidence that at the time Upton was shot, (defendant) initiated a fight or quarrel with the intent to prompt Upton to react."  We disagree.

> The court must give a requested instruction "if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39.)  We independently review whether substantial evidence supported the giving of an instruction. (*People v. Waidla* (2000) 22 Cal.4th 690, 733 (*Waidla*).)

Here, we conclude there was substantial evidence in the record to support giving CALCRIM No. 3472. Indeed, as we have now noted several times, on the morning of the shooting defendant knew his decision to trim the trees near Upton's residence would likely anger Upton. In fact, defendant warned the two workers of his "bad neighbor," told them he would handle any problems if, or—as the evidence shows in this case—*when*, they arose, and then left the immediate vicinity where they were working and stood about 100 feet away, in the middle of his property, by a fence line.

Defendant also decided to go forward cutting the trees, despite the fact Upton's and Zeller's cars were parked nearby and could be damaged by falling tree branches. Indeed, the day before, defendant had posted a "no parking" sign that ostensibly Upton had taken down and that he clearly had ignored. As we also have noted several times in this opinion, there also was evidence the confrontations between defendant and Upton (allegedly) were increasing in frequency and growing in intensity, as defendant testified. Although defendant believed he had the right to cut down the trees, and even if he did have such a right, a reasonable jury could find his decision to do so was intended to provoke a fight with Upton, one that turned deadly.

What's more, the fact defendant armed himself with the fully loaded revolver and hid that revolver from Upton merely because Upton "peeked" his head out of the front door suggests defendant *expected* a confrontation with Upton that morning and *intended* to use deadly force to end it. These findings are further supported by evidence that defendant shot Upton without warning while he was unarmed, as he merely stood on the dirt path.

On these facts, we independently conclude the court properly instructed the jury with CALCRIM No. 3472. (See *Waidla*, *supra*, 22 Cal.4th at p. 733.) As such, we further conclude defense counsel was not ineffective for failing to object to this instruction. (See *Maury*, 30 Cal.4th at p. 389.)

(Lodgment No. 7, People v. Vilkin, No. D067753, slip op. at 46-48.)

Clearly established federal law provides that Petitioner has a right to "a meaningful opportunity to present a complete defense." California v. Trombetta, 467 U.S. 479, 485 (1984) ("Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness."); Chambers v. Mississippi, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's

accusations.")   The failure to correctly instruct the jury on a defense may deprive a defendant of his due process right to present a defense.  Bradley v. Duncan, 315 F.3d 1091, 1099 (9th Cir. 2002).  "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."  Estelle v. McGuire, 502 U.S. 62, 72 (1991), quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973).

The instruction as given states: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."  (RT 1382.)  If, as Petitioner argues, there was no evidence he provoked the incident with the intent to use it as an excuse to shoot Upton, then the instruction could not have affected his defense because it simply instructed the jury to determine whether his claim of self-defense was legitimate or concocted.  Nevertheless, the state court reasonably found sufficient evidence was presented at trial to support the instruction, including: (1) the numerous and escalating adverse encounters between Petitioner and Upton leading up to the day of the shooting, (2) the fact that Petitioner decided to cut trees that day even though cars belonging to Upton and Zeller were parked where they could be damaged, (3) testimony that Petitioner instructed the men he hired that day to alert him when, not if, they encountered Upton, and (4) Petitioner's own testimony that he waited nearby with a concealed, loaded gun which he cocked when Upton approached unarmed.  The state court reasonably found this evidence allowed the jury to find Petitioner "expected a confrontation with Upton that morning and intended to use deadly force to end it."  (Lodgment No. 7, People v. Vilkin, No. D067753, slip op. at 48) ("These findings are further supported by evidence that defendant shot Upton without warning while he was unarmed, as he merely stood on the dirt path.")  Accordingly, the state court correctly found that sufficient evidence supported the instruction even if Petitioner had a right to cut trees and brush on his property, and he has not shown a violation of his right to present a complete defense.  McGuire, 502 U.S. at 72 (holding that a petitioner must show "a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution."); Chambers, 410 U.S.

at 294 ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.")

Further, evidence Petitioner relied on to show he acted in self-defense due to his disputes with Upton could have been viewed by the jury as a double-edged sword. The jury could have reasonably found Petitioner was building a defense of self-defense when he called Deputy Hill to ask about his right to carry a firearm on his property for self-defense due to a dispute with a neighbor, and when he asked the same question when he ran into Deputy Hill about a week later. Deputy Hill testified that Petitioner "wanted some general information, in case something happened in the future, when he's allowed to carry or use a firearm." (RT 616.) He also testified that in his opinion Petitioner "just wanted me to tell him that it was okay to carry a firearm on his property." (RT 618.)

The Court finds Petitioner has not established that the state court adjudication of this claim is contrary to, or an unreasonable application of, clearly established federal law protecting his right to present a complete defense. Nor is it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

**D. Claim Three**

Petitioner alleges in claim three that he received ineffective assistance of trial counsel due to defense counsel's failure to object to the contrived self-defense instruction "because under applicable law there was no factual support for the instruction, and because the instruction, and the prosecutor's arguments regarding it, significantly prejudiced petitioner by undermining the defense of complete or imperfect self-defense." (Pet. at 8.) Respondent answers that the instruction was properly given and would have been given even if counsel had objected. (Ans. Mem. at 31-32.) Petitioner replies that defense counsel should have objected because the instruction was improper for the reasons discussed in claim two. (Traverse at 17-18.)

This claim was raised in the petition for review and summarily denied. (Lodgment Nos. 8-9.) The claim was also presented to the appellate court on direct appeal. (Lodgment No. 4 at 49-55.) The Court will look though the silent denial by the state supreme court to

the last reasoned decision denying the claim, the appellate court opinion on direct appeal which, after finding substantial evidence supported the instruction, stated:

> As such, we further conclude defense counsel was not ineffective for failing to object to this instruction. (See *Maury*, 30 Cal.4th at p. 389.)

(Lodgment No. 7, <u>People v. Vilkin</u>, No. D067753, slip op. at 46-48.)

In addition to recognizing that the <u>Strickland</u> standard is controlling, the citation to page 389 of the <u>Maury</u> opinion states: "To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." <u>Maury</u>, 30 Cal.4th at 389. There is no indication in the record defense counsel was asked for an explanation why he did not object to the instruction. Thus, it appears the appellate court denied this claim on the basis that the record did not support a finding that "there simply could be no satisfactory explanation" as to why defense counsel failed to object to the instruction. Put another way, the state court found that because the instruction was supported by the evidence and properly given, there is no basis for finding defense counsel was deficient in failing to object because the instruction would have been given over a defense objection. That finding is consistent with clearly established federal law providing Petitioner must overcome a strong presumption counsel made a reasonable tactical decision to refrain from objecting to the instruction. <u>See</u> <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (recognizing a strong presumption that counsel took actions "for tactical reasons rather than through sheer neglect"), citing <u>Strickland</u>, 466 U.S. at 690 (holding that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."); <u>Burt v. Titlow</u>, 571 U.S. 12, 22-23 (2013) (recognizing "that the burden to 'show that counsel's performance was deficient' rests squarely on the defendant, . . . It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct (fell) within the wide range of reasonable professional assistance.'"), quoting <u>Strickland</u>, 466 U.S. at 687, 689.

That an objection would have been futile is a satisfactory explanation for defense counsel's failure to object.  See James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994) ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel.")  As discussed in claim two, the instruction was adequately supported by the evidence presented at trial, including Petitioner's own testimony of the history of his encounters with the victims and his actions on the day of the shooting.  In addition, the instruction did not distract from Petitioner's chosen defense of self-defense because it merely instructed the jury to ensure that Petitioner actually acted in self-defense, rather than having contrived a situation where he could murder the victim and falsely claim self-defense.  The appellate court's finding that the record failed to show "there simply could be no satisfactory explanation" for defense counsel's failure to object, is therefore neither contrary to, nor an unreasonable application of, clearly established federal law as set forth in the performance prong of Strickland, and is not based on an unreasonable determination of the facts.

To the extent the appellate court addressed only the Strickland performance prong without addressing the prejudice prong, this Court does not need to address prejudice because the adjudication of the claim on the performance prong alone is objectively reasonable.  See Strickland, 466 U.S. at 687 (holding that the prejudice prong need not be addressed where there is no deficient performance).  However, in an excess of caution, to the extent this Court needs to address the prejudice prong, a de novo review is required because it was not addressed by the state court.  See Wiggins v. Smith, 539 U.S. 510, 534 (2003) (reviewing de novo the question whether petitioner suffered Strickland prejudice where the state court adjudication of the claim was predicated only on the Strickland deficient performance prong); see also Berghuis v. Thompkins, 560 U.S. 370, 390 (2010) (holding that irrespective of whether AEDPA deference applies, a federal habeas court may conduct a de novo review to deny a petition but not to grant one).

As discussed in claim two, the challenged instruction was properly given because there was sufficient evidence Petitioner provoked the encounter with Upton for the purpose of shooting him, and even if there was no such evidence, the instruction would not have

had an adverse effect on the verdict because it merely instructed the jury to ensure Petitioner actually acted in self-defense as he claimed.  Petitioner was not prejudiced by the giving of a properly supported instruction, and defense counsel was not deficient in failing to make a futile objection to an instruction which would have been given even if an objection had been made.  See James, 24 F.3d at 27 ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel.")

Accordingly, the Court finds that the state court adjudication of this claim was neither contrary to, nor an unreasonable application of, Strickland, and was not based on an unreasonable determination of the facts.  The Court alternatively finds, under a de novo review, that Petitioner has not established deficient performance or prejudice under Strickland.  The Court recommends habeas relief be denied as to claim three.

### E.    Claim Four

Petitioner contends in his final claim that even if the foregoing alleged errors are insufficient to provide for federal habeas relief in and of themselves, their cumulative effect prejudiced him and violated his right to federal due process.  (Pet. at 9.)  Respondent answers that there were no errors to accumulate, and even if there were, there is no clearly established federal law providing for relief based on cumulative error.  (Ans. Mem. at 32-34.)  Petitioner replies that the Ninth Circuit has held that clearly established federal law provides for habeas relief based on cumulative error.  (Traverse at 18.)

This claim was raised in the state supreme court and summarily denied (Lodgment Nos. 8-9), after it was presented to the appellate court on direct appeal.  (Lodgment No. 4 at 56-57.)  The Court will look through the silent denial by the state supreme court to the last reasoned opinion addressing the claim, the appellate court opinion, which stated:

> In light of our decision on the various errors raised by defendant, we conclude the cumulative error doctrine is inapplicable in this case.  (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1344.)

(Lodgment No. 7, People v. Vilkin, No. D067753, slip op. at 48 n.8.)

/ / /

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing Chambers, 410 U.S. at 298, 302-03. Where no single trial error in isolation is sufficiently prejudicial to warrant habeas relief, "the cumulative effect of multiple errors may still prejudice a defendant." United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996). Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." Id., quoting United States v. Wallace, 848 F.2d 1464, 1476 (9th Cir. 1988). "Where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors." Frederick, 78 F.3d at 1381.

As discussed above, Petitioner has not established any error occurred in instructing the jury with the contrived self-defense instruction, in defense counsel's failure to object to that instruction, or in defense counsel's failure to move for a mistrial after the prosecutor elicited from the defense expert that the fight-or-flight syndrome could be considered a fad defense. Thus, the state court correctly determined there were no errors to cumulate.

In addition, there was no dispute Petitioner shot and killed Upton and pointed a gun at Zeller. The jury was called upon to determine whether Petitioner harbored a belief, reasonable or not, that in order to protect himself he needed to shoot Upton and point the gun at Zeller. There were seven full days of testimony, including Petitioner's testimony which took one and one-half days. (CT 204-26.) The jury deliberated three days, sending several notes and requesting a readback of Zeller's testimony, before a juror was replaced and they were instructed to begin deliberations again, after which they deliberated another full day before returning guilty verdicts. (CT 228-38; RT 1539-40.) The number of days of deliberation and the jury notes support a finding that the case against Petitioner was close. See Thomas v. Chappell, 678 F.3d 1086, 1103 (9th Cir. 2012) (holding that five days of deliberations coupled with requests for readback of testimony "strongly suggest that the case was close.") However, the evidence was not weak, but required a jury

determination of Petitioner's credibility. Defense counsel reasonably handled his expert's testimony regarding the fight-or-flight syndrome as a fad defense, and the contrived self-defense instruction did not undermine or detract from the defense. Petitioner has failed to identify errors which, either individually or cumulatively, prejudiced him.

Accordingly, the Court finds the state court adjudication of claim four was not based on an unreasonable determination of the facts, and was neither contrary to, nor an unreasonable application of, clearly established federal law which provides "that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." <u>Runnels</u>, 505 F.3d at 927. The Court recommends habeas relief as to claim four be denied.

## IV.  **CONCLUSION**

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition for writ of habeas corpus.

**IT IS ORDERED** that no later than **September 7, 2018**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **September 21, 2018.** The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order. <u>See</u> <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED: August 24, 2018

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

18cv0433-L (AGS)