UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MICHAEL VILKIN,

Petitioner,

v.

ROBERT NEUSCHMID, Warden, et al.,

Respondents.

Case No.:  18cv433-L-AGS

**ORDER (1) OVERRULING
OBJECTIONS TO REPORT AND
RECOMMENDATION; AND (2)
DENYING PETITION**

Petitioner Michael Vilkin, a state prisoner represented by counsel, filed a petition
for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his conviction for first
degree murder.  (Doc. no. 1 ("Petition").)  The Petition was referred to United States
Magistrate Judge Andrew G. Schopler for a report and recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Civil Local Rule 72.1(d).  After Petitioner supplemented his
Petition, Respondent filed a response, and Petitioner filed a traverse.  The Magistrate
Judge issued a report and recommendation (doc. no. 10 ("Report and Recommendation"
or "R&R"), recommending to deny the Petition.  Petitioner objected.  (Doc. no. 10
("Objections").)  Respondent did not respond to the Objections.  For the reasons which
follow, the Report and Recommendation is adopted, Petitioner's Objections are overruled,
and the Petition is denied.  Certificate of appealability is denied.

/ / / / /

In reviewing a Magistrate Judge's Report and Recommendation, the District Court "shall make a de novo determination of those portions of the report . . . to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Petitioner objected to the Report and Recommendation in its entirety.

## I.    BACKGROUND

Petitioner shot his neighbor John Upton. When Upton's girlfriend Evelyn Zeller approached Upton's body shortly thereafter, Petitioner pointed his gun at her and told her to move away. Petitioner was convicted of first-degree murder and assault with a firearm. The jury also found that Petitioner personally discharged a firearm when he shot Upton, and personally used a firearm to assault Zeller. In total, he was sentenced to a term of 64 years to life.[1]

### A.    Summary of Relevant Evidence

At trial, the jury heard nearly six days of testimony, including Petitioner's. In 2008 Petitioner purchased an undeveloped lot in Encinitas, which he planned to develop and sell. To that end, he spent several hours almost every day cutting down brush and trees. In 2011, Petitioner's neighbor John Bonanno rented his house to Upton and Zeller. Upton disapproved of vegetation clearing on Petitioner's property. Although the interactions between Upton and Petitioner were initially cordial, the relationship gradually became hostile.

According to Petitioner, the turning point was in spring of 2012, when he was clearing brush on his property close to Upton's house. Upton became angry. Petitioner felt verbally assaulted because Upton was a "big man" with a "big voice" and his body

---

[1]    The factual and procedural background is set out in detail in the Report and Recommendation. (R&R at 2-18 (quoting *People v. Vilkin*, case no. D067753, slip op. (Cal. Ct. App. Sept. 2, 2016) (doc. no. 8-22, "Opinion")).) Unless otherwise stated, all page numbers are assigned by the electronic case filing system.

language was threatening. (RT at 960-61; *see also id.* at 968.) Upton said he needed privacy and told Petitioner not to approach his house. (*Id.* at 970-71.) In response to this exchange, Petitioner decided not to cut brush in that area, but elsewhere on his property.

Nevertheless, Upton would approach Petitioner approximately once a week to protest his brush clearing in a hostile manner. Although Upton did not make any verbal threats of bodily harm, Petitioner perceived his body language and tone of voice as threatening. Upton cursed at Petitioner and sometimes called him names using foul language. Petitioner testified he was concerned that Upton might "snap." (*Id.* at 967.) He called the sheriff's department to complain that Upton did not let him clear brush or even walk on his own property.

Bonanno witnessed an exchange between Petitioner and Upton in the summer or fall of 2012. He testified Petitioner's activity was making Upton "nuts." Upton's demeanor at the time was "elevated," and his voice was loud. (RT at 642, 644.) Petitioner was visibly angry with Upton, repeatedly clinching his fist while holding a shovel in the other hand as he moved closer to Bonanno and Upton during the exchange.

Petitioner testified about another confrontation. He was smoothing the road on his property after dark in October 2012, when Upton approached him to approximately 30 feet. Petitioner saw a "short black pistol" in Upton's left hand by his side. (RT at 988.) When Petitioner told Upton that he would not continue working on the road, Upton left. (*Id.*) After seeing the gun, Petitioner felt that "something serious is going on," however, he did not call law enforcement because he believed that Upton had a right to carry a gun on his "rented property" and because Upton did not point the gun at Petitioner or make a "specific threat." (*Id.* at 989.) Petitioner recalled a prior conversation with the sheriff's department: "I remember that unless there is a specific threat, the sheriff department will not do anything." (*Id.*)

Petitioner purchased a gun. On October 31, 2012, he again called the sheriff's department and spoke to Deputy Sheriff Scott Hill. He asked if there were any laws that prevented him from carrying a gun on his own property, and explained he was having a

property dispute with his neighbor.  Petitioner told Deputy Hill that he had purchased a gun because he felt threatened by Upton.  According to Deputy Hill, as Petitioner described his interactions with Upton, they did not explain Petitioner's concern for his safety or his firearm purchase.

Petitioner had researched firearms on the internet.  In August 2012, he legally purchased a .22 caliber revolver because he was concerned about Upton's behavior.  In October 2012, he legally purchased a .44 magnum after he determined that the .22 caliber revolver "would not stop a big guy like John Upton."  (RT at 991-92.)  Petitioner thought, "he could come to me in the evening and who knows what he would do to me."  (*Id.* at 992.)  He "was afraid that one day it would be a deadly confrontation."  (*Id.*)

Deputy Hill told Petitioner he could not give him legal advice.  He suggested Petitioner contact an attorney and told him it was a bad idea to carry a weapon when one is expecting an argument.  A week later, Petitioner ran into sheriff's deputies in the street and approached them with the same inquiry because "a week before – [he] did not get what [he] wanted."  (RT at 981.)  One of the deputies was Deputy Hill, who gave Petitioner the same information again.

Petitioner took his gun with him "all the time" when he was on his property because he was concerned about his safety.  (RT at 998-99.)  He kept it loaded in its case together with ammunition and a video camera.  (*Id.* at 998-1000.)  He explained he carried the camera "in case Mr. Upton does something, I would record it."  (*Id.* at 1000.)

On one occasion in November 2012, Petitioner was clearing brush late at night close to Upton's house.  Upton approached him and told him to stop, because the brush provided a privacy screen.  When Petitioner agreed to trim only dead branches, Upton went back inside.  Nevertheless, in the morning all vegetation in that area was cut to the ground.  Zeller and Upton approached Petitioner.  Upton was upset that Petitioner did not keep his promise and yelled at him.  Zeller, who witnessed the exchange, testified that Upton "used foul language and was verbally intense."  (RT at 349.)  Petitioner, who was also upset, cursed and yelled back at Upton.  The exchange ended with Upton and Zeller

walking away. Zeller's impression was that Petitioner was not afraid of Upton, because he yelled back and stood his ground.

Petitioner hired Sampo Engineering to do a boundary survey in connection with his plan to construct a road. Vince Sampo visited the property in November 2012. Petitioner showed him his gun and told him he was "very concerned" about Upton and "need[ed] a weapon for self-protection." (RT at 1000.) Sampo testified that Petitioner "said something to the effect of . . . I would rather spend my life in prison than . . . get blown away or get shot." (*Id.* at 584 (ellipses added).)

In December 2012, Jesse Owens of Sampo Engineering visited Petitioner's property to locate monuments marking the boundaries. Owens and Petitioner could not locate the monuments along the boundary with Bonanno's property due to vegetation. Nevertheless, Owens determined that Bonanno's wall was encroaching, and informed Petitioner. He asked Petitioner to clear a small area close to Upton's house to help locate the markers at the next visit.

Despite weekly confrontations with Upton in early 2013, Petitioner continued to clear the brush. Petitioner described the hostility at the time to be at "a maximum level." (RT at 1003.)

On March 21, 2013, Petitioner called the sheriff's department because Owens needed some brush cleared to locate the monuments, and Petitioner wanted a deputy present to avoid a confrontation with Upton. Deputy Marshall Abbott responded. Petitioner told Deputy Abbott he felt threatened by Upton, that Upton had yelled at him and they had arguments about Petitioner's brush clearing. At Owens's request, Deputy Abbott contacted Upton to move his car, as the car was parked where the monument likely was located. Upton complied.

Owens described Upton as "very angry" when he came out of his house. (RT at 1226.) He screamed and cursed at Petitioner for approximately 15 minutes, including profanities, while Petitioner remained calm. (*Id.* at 1227, 1228.)

/ / / / /

Deputy Abbott testified that Upton appeared calm but frustrated. He complained about Petitioner's brush clearing. Deputy Abbott told him that Petitioner could cut brush on his own property. Petitioner approached while Deputy Abbott was speaking to Upton and said something that upset Upton. "Mr. Upton got pretty angry and began pointing at Mr. Vilkin and said, don't come any closer to me you [profanities]." (RT at 714.)

Deputy Abbott diffused the situation, told them he could not stay all day to prevent a fight, instructed them to stay separated and call the sheriff's department if there is a problem. According to Owens, Deputy Abbott spoke with Petitioner and told him that what he had heard from Upton at that time did not legally constitute a threat. He told Upton to avoid a physical confrontation. Upton replied something to the effect that he was not "stupid enough" or that "it wasn't worth it to him to get in any sort of trouble." (RT at 1231.)

After Deputy Abbott left, Petitioner and Owens continued unimpeded with their work. Petitioner also had workers cut brush in the same area a day or two later and had no trouble with Upton. (RT at 1028-29.)

On March 27, 2013, Petitioner nailed a no-parking sign to a large tree near Upton's house because he intended to cut the trees and brush in the area where Upon and Zeller parked their cars.[2] The incident occurred next day. When Petitioner arrived on the property with two workers, the sign was gone. Upton's and Zeller's cars were parked under the tree Petitioner intended to cut. Petitioner told his workers he had a "bad neighbor who is very hostile," but that he had a gun, and, if a man came out of the house, they should come to Petitioner, who would "deal with it." (RT at 1022.) When the workers started their work, Petitioner left to stand a distance away and hide because he was afraid of Upton. (*Id.* at 1029, *see also id.* at 1030-33.) He was "very concerned" that / / / / /

---

[2]    Petitioner allowed his neighbors to park on his property.

Upton "might do something . . . very dangerous." (*Id.* at 1031.) He was holding the gun case in his hand. (*Id.* at 1034.)

Petitioner could see Upton's porch from where he was standing. He was wearing his computer glasses. When asked about it, he explained:

> **[Petitioner:]** In case if there is a shoot-out, which I was afraid it might [. . .] happen. Right or wrong, [. . .] I feared him. And I would change to computer glasses . . . And you can say I was ready for a shoot-out.
>
> **[Mr. Uyar:]** And this was every time you went to the Lone Jack property, at least after you purchased the .44 magnum pistol -- or almost every time?
>
> **A.** Yes. [. . .]

(RT at 1184-85 (omissions and alterations indicated by brackets).)

A few minutes after he saw Upon come out of his house, Petitioner put his gun in his waistband because he "was getting ready for eventual confrontation that might happen" and he covered it up with his shirt. (RT at 1034, 1066, 1074, 1130.) Petitioner did not want Upton to see his gun because he did not want Upton to call 911. (*Id.* at 1101.) Although Petitioner always brought his gun when he was on his property, he kept it in its case. He believed this occasion was different:

> . . . he removed the sign. The cars are still there. It shows he's defiant. He has not complied, and he is likely to get involved in confrontation [*sic*] with me.
> And I am cutting the bushes in front of his house, which he did not allow me to do, and the confrontation was likely, given that he's not complying.

(*Id.* at 1166-67 (brackets added).)

Upton came out. He asked the workers if they were going to cut the trees close to his house and if he should move the cars. Petitioner then heard Upton say, "give me a few minutes," as Upton looked at Petitioner and started walking toward him. (RT at 1038.) Petitioner did not want to have eye contact with Upton "because it could provoke

him," and he saw Upton look at the tools on the ground, including an axe or a pic, as he was walking slowly toward Petitioner. (*Id.* at 1039-41; *see also id.* at 1134-36.) He was standing with his arms folded over the gun in his waistband. (*Id.* at 1136-37.)

According to Petitioner, as Upton walked toward him, Upton yelled, "Get the fuck out of here," in a threatening voice. (RT at 1042.) He looked "enraged." (*Id.*) At that point Petitioner "cocked [his] revolver." (*Id.*) They had an angry exchange of words. (*Id.* at 1043; *see also id.* at 1137-39.) Although Upton did not verbally threaten Petitioner, Petitioner felt threatened by Upton. (*Id.* at 1139.) He explained:

> [**Petitioner:**] I was feeling both angry and in fear of him.
>
> [**Mr. Berkon:**] What were you afraid of?
>
> **A.** I was afraid that he, being an unpredictable person, he could come and harm me.
>
> **Q.** Did you see anything in his hands?
>
> [¶]
>
> **A.** When he was about 10 feet away, I saw a pistol in his right hand.
>
> [¶]
>
> **Q.** How did that make you feel?
>
> **A.** It was . . . It was like one second . . . and I pulled out my revolver and shot him.

(RT at 1043-44 (ellipses in original, brackets added).) Petitioner testified Upton held the gun in his right hand at his side, pointed at the ground, and did not point it at Petitioner because Petitioner "would not allow him." (*Id.* at 1109; *see also id.* at 1103.) Petitioner explained why he did not warn Upton he was armed:

/ / / / /

**Mr. Berkon:**  Do you think you would have had time to brandish only . . . Meaning point your gun at Mr. Upton . . . and protect yourself if that didn't work?

[¶]

**Petitioner:**  Well, I cannot say -- only this way -- I saw the pistol and after that it was automatic, another second and the shot was placed.  I did not have time to think anything, it was automatic.

[¶]

Because I saw a pistol in the hand of a mad man, and there was no thinking involved, it was just automatic.

(RT at 1161-62 (ellipses in original, brackets added); *see also id.* at 1044.)

The first shot was in the stomach.  (RT at 1044.)  Petitioner testified why this was not enough:

**[Petitioner:]**  I did not know if it hit him or not, but he made a couple more steps toward me.

[¶]

**[Mr. Berkon:]**  What did you do next?

**A.**  It went through my mind that he was wearing a bullet vest.  And I screamed "Stop," I looked up, and shot him in the head.  (Indicating.)

[¶]

**Q.**  Did you hit him the second shot [*sic*]?

**A.**  Obviously.  He fell.

(RT at 1044-45; *see also id.* at 1046, 1071-72; 1140.)  When questioned about the two shots, Petitioner, who is a Russian immigrant, testified he shot the way he was trained in the Russian military.  (*Id.* at 1047 ("I have been trained to shoot specially in Russian

/ / / / /

military."); *id.* at 1048 ("I fired the way I have been trained.").)  He testified he was in shock after filing the shots.

The workers witnessed the confrontation.  They saw Upton came out of his house.  He told them he would move the cars.  Both workers described him as calm, not yelling or cursing.

One of the workers, Macario Mendoza Matias, did not see Upton holding anything in his hands.  He saw Upton walking toward Petitioner.  According to Matias, Upton said to Petitioner, "Can you do me a favor?"  (RT at 121.)  Upton was not yelling and did not appear angry.  He walked slowly.  Shortly thereafter, Matias heard a gunshot.

The other worker, Fredy Alva Rodriguez, was carrying away the branches Matias had cut.  To do this, he passed Upton about three times in close proximity.  Although Rodriguez saw and heard Upton talking to Petitioner, he did not understand all the words because he does not speak English.  According to Rodriguez, Upton was not yelling and did not appear angry when he spoke to Petitioner, and he was not moving.  On the other hand, Petitioner was moving his hands side to side nervously.  Rodriguez heard Petitioner say "Fucking shit" to Upton.  (RT at 194.)  Petitioner appeared angry at the time.  Rodriguez did not see Upton make any motions to suggest he was going to attack Petitioner.  When Rodriguez heard the first shot, he was some distance away from Upton.  He testified that Petitioner fired the second shot when Upton was on the ground.

Zeller heard the gunshots and came out of the house.  She saw Petitioner talking on his phone.  When she saw Upton's body,  Petitioner pointed his gun at her and told her to not come any closer.  Zeller ran away.

Petitioner called 911 and told the dispatcher he had just shot his neighbor.  He waited for the deputies to arrive and directed them to Upton's body.  The deputies retrieved Petitioner's gun case, which contained the .44 magnum, ammunition, and a video camera.  Under Upton's body they found a black cell phone.  During subsequent investigation, the deputies found a .40 caliber pistol and a box of ammunition in the

/ / / / /

nightstand in Upton's bedroom, which did not appear to have been fired. Zeller testified that Upton had shown her the gun several months before.

### B.    Summary of Procedural Background

At trial Petitioner claimed he shot Upton in self-defense because he erroneously thought he saw a gun in Upton's hand. Based on the testimony of his expert Dr. Raymond Murphy and his own testimony, Petitioner argued that he mistook Upton's cell phone for a gun because he was experiencing the fight-or-flight syndrome due to Upton's aggressive and threatening behavior over the previous year. Among other things, the jury was instructed on the perfect and imperfect self-defense. On the prosecutor's request, the jury was also given a contrived self-defense instruction. The jury found Petitioner guilty. The judgment was affirmed on appeal. (Opinion at 48).) The petition for review by California Supreme Court was summarily denied. (Doc. no. 8-24.)

Petitioner petitions this Court for federal habeas relief. He presents four claims in support of the argument that his federal constitutional rights were violated: (1) ineffective assistance of counsel because counsel did not move for a mistrial when the prosecutor asked Dr. Murphy if he had previously referred to the fight-or-flight defense strategy as a fad; (2) insufficient evidence for the contrived self-defense instruction; (3) ineffective assistance of counsel for failure to object to the contrived self-defense instruction; and (4) cumulative effect of the errors.

### II.    DISCUSSION

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief unless the state court's adjudication of the petitioner's claim (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court;" (2) "involved an unreasonable application of" such law; or (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling . . . was so lacking in

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington v. Richter*, 562 U.S. 86, 103 (2011).  In making this determination, the court looks to the last reasoned state court decision to address the claim.  *Martinez v. Ryan,* 926 F.3d 1215, 1223 (9th Cir. 2019).  The last reasoned state court decision is the appellate Opinion.

### A.    Reference to Fad

Petitioner claims his counsel was ineffective in violation of the Sixth Amendment because he failed to move for a mistrial after the prosecutor asked Dr. Murphy if he had previously termed the fight-or-flight defense strategy a fad.  The prosecutor was referring to Dr. Murphy's testimony outside the jury's presence at a motion *in limine* hearing:

> **[Mr. Uyar:]**  Of those six times that you testified on fight-or-flight, including the 402 hearings, can you give me a timeframe?  Is that over your entire 38-year career, or is that within, say, five years, ten years?
>
> **[Dr. Murphy:]**  Gosh, you're asking for guesses . . .  Um, probably ten years . . .
> I think things like fight-or-flight go through fads in terms of testimony on them.
>
> **Q.**  Are we in a fight-or-flight fad now?
>
> **A.**  I think so, yes.
>
> **Q.**  What makes you say that?
>
> **A.**  Well, I've had a number of requests for information on fight-or-flight, or possible testimony on fight-or-flight.

(RT at 256-57 (alternations on brackets, ellipses in original).)  On further questioning, Dr. Murphy explained:

> **[Mr. Berkon:]**  This concept of a fad, now you didn't mean to suggest that fight-or-flight is somehow not a legitimate syndrome by suggesting it's a fad?

**[Dr. Murphy:]** Oh, no, not at all. I think my implication was that defense strategies change. . . .

(RT at 264 (brackets and ellipsis added).)

The court denied the prosecutor's motion *in limine* and admonished him not to refer to the defense strategy as a fad in the presence of the jury. (*See id.* at 1206.) Nevertheless, the prosecutor brought out the reference in front of the jury:

> **[Mr. Uyar:]** You mentioned phases of acceptability when you were describing whether -- or how this defense is being used currently. Is that what you meant – you were saying "phases of acceptability"?
>
> **A.** Yeah, I think so.
>
> **Q.** And I believe you previously even termed it as a fad?
>
> **A.** "Fad" in the sense of a defense strategy.

(RT at 1204 (brackets added).) The judge immediately called counsel to side bar and then addressed the jury:

> **The Court:** All right, ladies and gentlemen, there was a question asked as to whether or not this was considered a fad.
>
> A fad can have different contexts, it can have different meanings. What I am telling you is that the context within which it was used in this case is inappropriate. That was an inappropriate question for the people to ask, and it gave an inappropriate -- left an inappropriate impression with the jury. Therefore, you are to disregard that question, you are to disregard the answer, and you're not to consider it in any way in your considerations of this case.

(*Id.* at 1205.) On re-direct, Petitioner's counsel asked Dr. Murphy to explain:

> **[Mr. Berkon:]** . . . Just to make sure something is cleared up, Dr. Murphy: This fight-or-flight syndrome we've been talking about, it's an accepted, valid phenomenon; is that fair to say?
>
> **A.** Yeah, I think so. It's a physiological response that can be validated. . . .

18cv433-L-AGS

[¶]

    **Q.** . . . And it's been studied . . . as you testified, for almost a hundred years?

    **A.** That's right.

    **Q.** . . . [T]he frequency that fight-or-flight syndrome is used in criminal trials over the course of your 38 years, have you seen that there are times when it's not used as much, it varies in frequency?

    **A.** Like patterns of use?

    **Q.** Yes.

    **A.** Yeah, sure.

    **Q.** But that doesn't minimize or mitigate the fact that the phenomenon exists?

    **A.** Oh, no, probably has nothing to do with the phenomenon itself.

(RT at 1211-12 (brackets and ellipses added).)

Petitioner argues his counsel should have moved for a mistrial, and that in failing to do so, he "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington,* 562 U.S. at 104. He contends the state court's decision to the contrary warrants habeas relief.

To prevail on a claim for ineffective assistance, Petitioner "must show both that counsel's performance was deficient, and that he suffered prejudice due to counsel's deficiency" in violation of *Strickland v. Washington*, 466 U.S. 668 (1984). *Martinez*, 926 F.3d at 1226 (quoting *Strickland*, 466 U.S. at 687).

In analyzing and rejecting the claim, the state appellate court applied *People v. Maury,* 30 Cal.4th 342, 389 (2003), and *People v. Weaver,* 26 Cal.4th 876, 925-26 (2001), both of which rely on *Strickland.* (Opinion at 43-46.) On habeas review, this Court does not review the defense counsel's conduct *de novo* under *Strickland* but reviews the state

appellate court's decision under AEDPA's deferential standard of review.  *Harrington,* 562 U.S. at 101.

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior [Supreme Court] decision . . ..

*Id.* at 102.  "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id.* at 101.

"Surmounting *Strickland*'s high bar is never an easy task. . . . Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington,* 562 U.S. at 105 (internal quotation marks and citations omitted, emphasis in original).  When, as here, *Strickland*'s and AEDPA's deferential standards "apply in tandem, review is doubly so." *Id.* (internal quotation marks and citations omitted).

"*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Harrington*, 562 U.S. at 110 (internal quotation marks and citations omitted).

> [T]he standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.

*Id.* at 105 (internal quotation marks and citations omitted).

The success of Petitioner's self-defense arguments did not hinge on Dr. Murphy's testimony.  Dr. Murphy testified about the fight-or-flight syndrome only in general terms and could not testify about Petitioner's state of mind.  (*See* RT at 269-76 (*in limine* ruling), 1195 (Dr. Murphy).)  The success of Petitioner's defense depended on whether the jury believed that Petitioner's prior confrontations with Upton rendered him so fearful that he experienced the fight-or-flight syndrome when Upton approached him, which caused him to mistake Upton's phone for a gun.  As the judge noted in ruling on the prosecutor's *in limine* motion:

> . . . I don't really think it's going to be the fight-or-flight that's going to carry the day, it's going to be whether or not -- how they perceive the circumstances under which this incident occurred.

(RT at 276; *see also id.* at 270 (court), 273 (court), 1195 (Dr. Murphy).)  Given the judge's observation and the immediate curative instruction, it was unlikely that a motion for mistrial, even if made, would have been granted.  *See People v. Jennings,* 53 Cal.3d 334, 380 (1991).

"There are . . . countless ways to provide effective assistance in any given case." *Harrington*, 562 U.S. at 106 (internal quotation marks and citations omitted).  Instead of making a futile motion, defense counsel focused on diffusing the "fad" reference on redirect.  He then called two witnesses to bolster the credibility of Petitioner's testimony that he feared Upton.  Owens, who witnessed a confrontation between Upton and Petitioner a week before the incident, testified to Upton's anger toward Petitioner.   (RT at 1214-37.)  Duane Byram, Zeller's former husband who shared child custody with her, testified about Upton's bullying behavior toward him.  (RT at 1237-63.)   In closing, Petitioner's counsel vigorously advocated for Petitioner.  He marshalled the evidence in support of self-defense, and bolstered the credibility of Petitioner's testimony that he shot Upton out of fear, without thinking, because he was experiencing the fight-or-flight syndrome.  (*See* RT at 1439-72 (closing).)  It was not unreasonable for the state appellate court to conclude that counsel provided adequate representation under *Strickland.*

If the counsel's representation were found to be deficient, Petitioner would also have to show prejudice.  "With respect to prejudice, a challenger must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Harrington,* 562 U.S. at 104 (internal quotation marks and citations omitted).  In this regard,

> [T]he question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently.  Instead, *Strickland* asks whether it is reasonably likely the result would have been different.

This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

*Id.* at 111-12 (internal quotation marks and citations omitted).

Petitioner contends he was prejudiced. The prejudice inquiry involves consideration of counsel error in the context of the evidence introduced at trial. *See Martinez,* 926 F.3d at 1233; *Rowland v. Chapell,* 876 F.3d 1174, 1185 (9th Cir. 2017).

The jury heard nearly six days of testimony from more than twenty witnesses, observed their demeanor, and evaluated their credibility. Several of the witnesses saw Petitioner's interactions with Upton in the months leading to and on the day of the incident. Petitioner testified about it for a day and a half, including that he feared Upton, felt threatened by him, and shot him without thinking out of fear for his life. (*See* RT at 939-1186.)

Much of the evidence contradicts self-defense. It does not show that Petitioner was afraid of Upton and describes Upton immediately before the incident as calm rather than angry and threatening. Parts of Petitioner's own testimony support the prosecution's theory that Upton's murder was premeditated. It would not be unreasonable to conclude that the jury did not believe Petitioner, and that the outcome of the trial had little, if anything, to do with Dr. Murphy's general explanation of the fight-or-flight syndrome. It was therefore not unreasonable for the state court to conclude that Petitioner was not prejudiced by his counsel's failure to move for a mistrial.

In light of the record, the state appellate court was not unreasonable in finding that Petitioner did not make a sufficient showing in support of his ineffective assistance claim under *Strickland*. Petitioner's first claim is therefore rejected.

## B.    Contrived Self-Defense

Petitioner next contends that the trial court deprived him of his due process right to present a complete defense when it granted the prosecutor's request for a contrived self-

defense instruction.  The trial court gave the instruction titled "Right to Self-Defense May Not Be Contrived," which stated,

> A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force.

(RT at 1382.)  Petitioner contends the instruction should not have been given because it was not supported by substantial evidence.  He further argues that the instruction negated his self-defense, thus depriving him of due process.  *See California v. Trombetta*, 467 U.S. 479, 485 (1984).  Finally, he claims that his counsel's failure to object to the instruction amounted to ineffective assistance of counsel.

The prosecution's theory of contrived self-defense was that Petitioner provoked the incident by setting up the circumstances where a violent confrontation with Upton would occur and used it to shoot Upton seemingly in self-defense.  (*See, e.g.,* RT at 1436.)  The state appellate court found that the instruction was supported by sufficient evidence, and therefore also concluded that counsel was not ineffective. (Opinion at 46-48.)

Petitioner argues that the state court misapplied California law of contrived self-defense.  (Objections at 22 ("Both the Court of Appeal and the R&R are incorrect because they are based on a fundamental misunderstanding of the doctrine of contrived self-defense.").)  Although Petitioner concedes that the instruction as given "contains a correct statement of the law" (*id.* at 23; *cf.* Jud. Council of Cal., Crim. Jury Instr. No. 3472), he argues that under California law, the doctrine applies only if the defendant's provocation is itself a crime.  (Objections at 29 ("contrived self-defense must be based on wrongful conduct amounting to a crime").)

Review of this issue is limited by AEDPA.  28 U.S.C. § 2254(d).

> [I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.

*Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Accordingly, this Court expresses no opinion whether the state appellate court's understanding of contrived self-defense was correct.

Petitioner further claims that as interpreted by state court, the contrived self-defense instruction eviscerated his defense, thus depriving him of due process. *See Trombetta,* 467 U.S. at 485 ("Under the Due Process Clause of the Fourteenth Amendment, . . . criminal defendants [must] be afforded a meaningful opportunity to present a complete defense."). He argues that if the provocation itself need not be a crime, then any act, even a lawful act, would deprive a defendant of self-defense. (Objections at 31.) This argument does not take into account all of the instruction as given. The instruction applies only if a defendant "provokes a fight or quarrel *with the intent to create an excuse to use force*." (RT at 1382 (emphasis added).) Because the application of the instruction is limited to provocations intended to create an excuse for use of force, *i.e.,* set up the circumstances to create a self-defense, it was not unreasonable for the state court to hold that the instruction did not deprive Petitioner of due process. The state court's conclusion was therefore not "contrary to . . . clearly established Federal law, as determined by the Supreme Court" and did not involve "an unreasonable application of" such law. 28 U.S.C. § 2254(d)(1).

Finally, Petitioner argues that his due process rights were violated because the instruction was not supported by sufficient evidence. The state appellate court found that substantial evidence was adduced at trial to support the instruction. (Opinion at 47-48.) This finding was not unreasonable.

Substantial evidence supports the conclusion that Petitioner provoked the incident, which he had been anticipating for some time. Petitioner carried a loaded gun and wore computer glasses every time he went to his property. (RT at 1184-85 ("In case if there is a shoot-out, which I was afraid it might . . . happen.").) A week before the incident, when Owens was trying to locate a boundary monument where Upton and Zeller parked, Petitioner called the sheriff's department for protection. He told Deputy Abbott he

wanted to avoid a confrontation. Petitioner was especially concerned about a confrontation on the day of the incident because Upton had removed the no-parking sign and parked in the same spot as the week before, when Deputy Abbott responded to Petitioner's call. Petitioner proceeded with the work anyway. He parked his car where he could return to it without passing Upton's house (*id.* at 1089), observed from a distance and put a loaded gun in his waistband to be ready to shoot. By proceeding on that day, he created what he termed a "special occasion" (*id.* at 1035) he knew would provoke a fight or a quarrel with Upton.

Substantial evidence further supports the conclusion that Petitioner provoked the confrontation with intent to create an excuse to shoot Upton and claim self-defense. He testified that Upton's hostility escalated because Upton "saw that there was no punishment for him." (*Id.* at 969.) Petitioner purchased a powerful revolver especially with Upton's large size in mind. When he came to his property on the day of the incident, he was "ready for a shoot-out." (RT at 1184.) He did not shoot Upton before, because Upton did not approach him. (*Id.* at 1159 ("He did not come to me . . . so that [*sic*] I had not reason to shoot him.").) On the day of the incident, he provoked Upton to approach him. Although he knew Upton was especially likely to get angry, Petitioner did not call the sheriff's department for protection as he did the week before. This supports the inference that Petitioner did not want protection but an excuse to shoot Upton. Petitioner did not take any other measures to avoid shooting Upton and did not warn him he was armed. (Id. at 1130 ("I did not want to give him an opportunity to see the handgun.").) Instead, he "got ready for a shoot-out" (*id.* at 1184) and shot to kill when Upton approached him (*id.* at 1070 ("I know how to shoot.")).

Based on the record, the state court finding was not "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). Petitioner's second claim alleging violation of due process is therefore rejected.

Petitioner's third claim for ineffective assistance of counsel is derivative of his second claim. Because the contrived self-defense instruction was supported by substantial evidence and did not violate Petitioner's due process rights, his counsel's failure to object did not constitute ineffective assistance under *Strickland*. *See Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective assistance.").) Accordingly, Petitioner's third claim is also rejected.

### C.    Cumulative Effect

Finally, Petitioner contends that the cumulative effect of the claimed errors violated his right to a fair trial under the Due Process Clause. *See Chambers v. Mississippi,* 410 U.S. 284, 302 (1973).

> The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. . . . The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal.

*Parle v. Runnels,* 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers*). On federal habeas review, cumulative error warrants relief only where "the combined effect of the errors had a 'substantial and injurious effect or influence on the jury's verdict.'" *Id.* (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993)).

The cumulative error doctrine assumes a finding of multiple errors. On appeal, the state court concluded that it did not find any errors, therefore the cumulative error doctrine was inapplicable. (Opinion at 48 n.8.) This Court has rejected all of Petitioner's individually claimed constitutional errors. Furthermore, based on the evidence presented to the jury, the claimed errors, whether or not individually rising to the level of a constitutional violation, did not have a substantial and injurious effect on the verdict. In the absence of any error, the state appellate ruling of no cumulative error does not warrant habeas relief under 28 U.S.C. § 2254(d)(1). Accordingly, Petitioner's final claim is rejected.

### III.    CONCLUSION

For the foregoing reasons, Petitioner's Objections are overruled, the Report and Recommendation is adopted as modified herein, and the Petition is denied.

### IV.    CERTIFICATE OF APPEALABILITY

Petitioner requested a certificate of appealability under 28 U.S.C. § 2253(c).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When, as here,

> a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. Daniel,* 529 U.S. 473, 484 (2000).  Upon consideration of Petitioner's claims for purposes of certificate of appealability, the request is denied.

**IT IS SO ORDERED.**

Dated:  September 12, 2019

_____
Hon. M. James Lorenz
United States District Judge

18cv433-L-AGS